Filed 5/29/20 (unmodified opn. attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

THE PEOPLE,

     Plaintiff and Respondent,

         v.

JOSEPH SON,

     Defendant and Appellant.

F076252

(Super. Ct. No.:  BF150700A)

**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]**

**THE COURT:**

It is hereby ordered that the opinion filed herein on May 27, 2020, be modified as follows:

1.  In the lead opinion, on page 28, the first sentence under the heading "*A. Synopsis of Analysis*," is deleted and replaced with the following:

> Son, at sentencing, was ordered to pay a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), and a $280 restitution fine (§ 1202.4, subd. (b)).[14]

2.  In Justice Snauffer's concurring opinion, the second and third sentences of the second paragraph are deleted and replaced with the following:

> In cases where minimum fines are imposed, Penal Code section 1202.4, subdivision (c), precludes consideration of the defendant's ability to pay.

---

**14**    The court also imposed and stayed a matching $280 parole revocation restitution fine (§ 1202.45, subd. (a)).  However, because this fine is essentially a corollary of the restitution fine imposed under section 1202.4, subdivision (b), we will not separately address it.  (See § 1202.45, subd. (a).)

Except for the modification set forth above, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

SMITH, J.

WE CONCUR:

FRANSON, Acting P.J.

SNAUFFER, J.

## CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F076252 |
| Plaintiff and Respondent, | (Super. Ct. No. BF150700A) |
| v. | |
| JOSEPH SON, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Carlos A. Martinez and Eric L. Christoffersen, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Fact section and parts I, II, and III of the Discussion section.

Son challenges his conviction for voluntary manslaughter on grounds that trial counsel committed structural error under *McCoy v. Louisiana* (2018) 138 S.Ct. 1500 (*McCoy*).  He further argues the trial court prejudicially erred in failing sua sponte to instruct the jury on involuntary manslaughter.  We reject these contentions.

Son also asks us to independently review the trial court's rulings, as well as the sealed transcripts and documents, related to a *Pitchess* motion filed by trial counsel.[1]  We have done so and found no impropriety in the court's inquiry and rulings.

Finally, Son challenges, under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the trial court's imposition, without conducting an ability to pay hearing, of court operations and court facilities assessments, as well as a restitution fine.  With regard to the court assessments, we conclude imposition of these assessments, without first giving the defendant *an opportunity* to request an ability to pay hearing to show he cannot pay them, is unconstitutional.  Accordingly, remand is required to give Son *an opportunity* to request an ability to pay hearing.  On remand, should Son request such a hearing and show he cannot pay the court operations and court facilities assessments at issue, the court must vacate them.  In the event Son does not request an ability to pay hearing, or requests such a hearing but fails to show he cannot pay the relevant court assessments, they shall remain in effect.  As for the restitution fine, we conclude that, in contrast to the court assessments, an ability to pay hearing is *not* constitutionally required before imposition of the restitution fine.  We therefore affirm the restitution fine imposed in this matter.

The matter is remanded for further proceedings consistent with this opinion.  The judgment is otherwise affirmed.

---

[1]  *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

## PROCEDURAL HISTORY

Son was charged, by an amended information filed in the Kern County Superior Court, with committing, on October 10, 2011, while serving a life sentence, the crime of assault, with malice aforethought and by means of force likely to produce great bodily injury.  (Pen. Code, § 4500.)[2]  The information also alleged that Son had an August 25, 2011 conviction for torture (§ 206) that qualified as both a strike prior (§§ 667, subds. (c)-(j) & 1170.12, subds. (a)-(e)) and as a serious felony prior (§ 667, subd. (a)).

A jury found Son not guilty of the charged offense but guilty of the lesser included offense of voluntary manslaughter.  (§ 192, subd. (a).)  In a bifurcated proceeding, the trial court found the prior conviction allegations to be true.

Son, who was already serving a life term in prison, was sentenced to 22 years on the voluntary manslaughter conviction (double the upper term of 11 years).  (§ 193, subd. (a).)  In addition, he was sentenced to five years on the serious felony enhancement allegation.  (§ 667, subd. (a).)  His aggregate sentence in the instant case was 27 years, to be served consecutive to the life term he was serving in a prior case.

## FACTS[*]

### A.    Cellmates at Wasco State Prison

On October 10, 2011, Bradley Winters was working as a correctional officer at Wasco State Prison in Kern County.  He was one of three "floor officers" in Baker Building 5, which housed about 200 inmates, with two inmates per cell.  The cell doors could only be opened by an officer in the control booth.  Son and Michael Graham occupied cell 228.  On that same side of the building, there was a temporary overflow section, known as the "T-bunk" area, that housed approximately 30 inmates.

---

[2]    All subsequent statutory references are to the Penal Code unless otherwise specified.

[*]    See footnote, *ante*, page 1.

3

**B.    Son's Request for a Cell Change**

That afternoon, Winters was working the third "watch" or shift, which ran from 2:00 p.m. to 10:00 p.m.[3]  Beginning at about 4:45 p.m., he conducted a head count of inmates to ensure they were all present.  This usually took 15 minutes and had to be completed and reported by 5:00 p.m.  Inmates were supposed to stand and show their I.D. cards.  The cell doors remained closed.

When Winters reached cell 228, Son was standing, but Graham remained lying on his lower bunk with his head facing the door and his hands on his chest or stomach. Winters made eye contact with Graham but did not make him stand, as Winters did not want to lose mental track of the count.[4]

Son asked to be moved to a different cell, but Winters explained that cell moves, with the exception of "emergency moves," were done on the second watch.  Son was, however, "adamant" that he wanted to move as he had found a cellmate on the other side of the building.  Winters, in response, advised Son to talk to the "second watch" officer.

Since Wasco is a "reception center," new inmates arrived continuously and needed to be housed.  Consequently, non-emergency or "[c]onvenience moves" were a "fairly common occurrence," and were overseen by a "housing officer" during the second watch.  Winters did not detect any emergency in connection with Son's request to move to a different cell.  Nor did Son indicate there was an emergency, or even suggest he was having problems with Graham.  Had Son indicated there was an emergency, the revelation would have prompted Winters to abandon the headcount and "immediately" separate the cellmates.  Son had not asked Winters for a cell move on any other occasion.

---

[3]    There were three watches:  10:00 p.m. to 6:00 a.m. (first watch); 6:00 a.m. to 2:00 p.m. (second watch); and 2:00 p.m. to 10:00 p.m. (third watch).

[4]    Winters accurately noted in a watch logbook that Graham was lying down during the count.  He knew, however, that he would get into trouble for not having Graham stand.  Subsequently, he did in fact receive a letter of reprimand for the lapse.

## C. Graham's Death

About 20 minutes later, when Winters was in his office, he heard inmates from the T-bunk area yelling "man down" and pointing to cell 228. Winters went to cell 228 and saw Son washing his hands in the sink at the front of the cell; Son was also yelling "man down." Son moved to the back of the cell, then returned to the front to wash his hands again. Graham was still lying on his bunk in about the same position as before. His eyes were open and appeared to be looking up, and his palms were along his sides. He showed no visible signs of life.

Winters reported a medical emergency ("Code 1 medical"). Son remarked to Winters, "I told you I need to move." Son appeared calm and was not "worked up at all." He did not look scared, nor was he breathing hard. He never said he was attacked or hurt.

An officer in the control booth opened the door of Son's cell. Son was handcuffed—he needed two sets of handcuffs because he was "big, stocky," and "hefty"—and taken to a holding cell.[5] Medical staff arrived and unsuccessfully performed CPR on Graham.

Nurse Laura Bernal noticed that Graham showed no signs of life and was "cool to the touch," which usually occurs "a little time" after death. Physically, he seemed "[f]rail." Bernal noted Graham had "bruises all over [his upper torso]" and his "chest was collapsed in," something she had never seen before. In attempting to administer CPR, Bernal discovered that Graham's chest had "no resistance." There was "no bone structure"; rather "[i]t had the consistency of … jello."

Sergeant Bill Eveland similarly noticed bruising all over Graham's torso, along with the fact that the center of Graham's "chest was kind of concave, abnormal looking." Eveland and three other officers carried Graham to a gurney; Graham was taken to the

---

[5]     Son was approximately 5'5'' tall and weighed 235 pounds. Graham was 5'9'' tall and weighed 161 pounds.

prison's emergency room, where he was declared dead.  Son, who was in a holding cell, remarked to Eveland:  "Is he dead?  He fell down twice and I helped him up."

Son was searched for contraband (including weapons) but none was found.  Nor were any injuries detected on his body.  Officer Robert Zaragoza photographed cell 228, which had been padlocked following Graham's death.  Zaragoza determined that "nothing was disturbed" in the cell.  He explained:  "[T]here was no struggle as I viewed the cell inside; however, I have been in numerous cells when I've done crime scenes, and I've discovered different evidence whereas this one I didn't discover anything that would lead me to believe there was a struggle involved."  Zaragoza did not find any weapons in the cell or in the toilet.  Zaragoza did, however, discover two letters sent to Son by another inmate, discussing the possibility of Son moving to a different cell.[6]

## D.    Graham's Autopsy

Forensic pathologist Robert Whitmore performed an autopsy on Graham's body. Dr. Whitmore determined that the cause of death was "multiple blunt force trauma," that in turn caused bleeding and impaired Graham's ability to breathe.  Dr. Whitmore's conclusions were based on numerous injuries to Graham's chest, abdomen, and neck. Each of Graham's lungs had a large bruise and the lower lobes were internally torn, which would have required "[a] large force" because the chest had to be "completely compressed" to cause such damage.  Graham suffered "multiple fractures" to his ribs and bled internally.  His sternum was fractured twice, which was the reason his chest appeared concave.  There was a hemorrhage to the pericardium, normally protected by the rib cage.  There was a large periaortic hematoma to the superior mesenteric artery, contusions to the vena cava, bleeding in the intestinal cavity, a subscapular hematoma on the liver, a lacerated spleen, and contusions to the duodenum and large bowel.  Graham's

---

[6]    Since his arrival on September 16, 2011, at Wasco State Prison, Son had three other cellmates before he was housed with Graham on September 26, 2011.

6

neck muscles had hemorrhaged, which was "consistent with strangulation or an attempted strangulation or a grabbing of the neck or a blow to the neck." Graham had no injuries to his hands.

Dr. Whitmore clarified that the chest injuries Graham suffered were not caused by CPR. He explained, a "large force" was "applied to the chest" to cause these injuries. The macerated lungs were not caused by CPR, but by squishing the chest so completely that it was rendered "flat." As for the "sternal fractures," while those could occur with CPR, "a twice fractured sternum" was "not very common in CPR. In addition, the fact that Nurse Bernal noticed a depression in Graham's chest before she commenced CPR demonstrated that the injuries were not caused by CPR. Dr. Whitmore also noted that Graham suffered from chronic hepatitis C and associated liver cirrhosis, which would make a person weak and cause the person to bleed and bruise more easily than he would otherwise. However, Dr. Whitmore clarified that these diseases would not make rib and sternum fractures more likely, nor would they make tissues more prone to tearing.

Following Graham's death, Son was incarcerated at Corcoran State Prison. There, he told Officer Alonzo Aranda that he knew martial arts and would get Aranda tickets to his fights when he got out of prison. Son talked about his knowledge of martial arts with Aranda on at least three occasions. Son also told Aranda that were the latter to encounter problems with inmates, he should put them in Son's cell and Son "would take care of 'em like he did his last cellie."

## E. Defense

Son took the stand in his own defense and explained he was first arrested in 2008 and incarcerated in the county jail for three and a half years until he was sentenced to state prison. Once in prison, he was attacked on nine occasions by inmates and learned it was better for him to lose a fight because otherwise, as an Asian, he would suffer severe retaliation. When Son was moved to cell 228, his cellmate, Graham, repeatedly berated

7

him with racial epithets, told him to leave, and beat him. Graham had also noted that he was suicidal and had no problem killing himself as well as Son. Officer Winters, however, refused to move Son despite Graham's abusive conduct.

On the day in question, Graham attacked Son with a knife. Son managed to take it away and slammed Graham hard against a wall and hit him "at least eight to twelve times nonstop" in the torso. Thereafter, the two made up and Graham flushed the knife down the toilet. Graham subsequently fell down, twice. Son helped him up both times and then summoned officers for help.

Son acknowledged he was convicted of two felony crimes of moral turpitude in 2008 and torture in 2010; he had lied to the Huntington Police Department about his involvement in the latter. Son described himself as a "nonviolent" person. Nonetheless, he admitted that his conviction for torture stemmed from a Christmas Eve incident in which he raped a woman three times with the help of his cohorts and held a gun to her head. He further admitted he remained at large for 19 years after the rape and did not turn himself in to authorities. Prior to his apprehension, he fought in martial arts cage or ring matches that essentially had "no rules."

Nurse Joni Jones testified that Graham had been prescribed Cogentin, Risperdal, and Venlafaxine (Effexor). He had recently been on suicide watch at Wasco State Prison, had a history of being suicidal, and was hospitalized in Vacaville on three or four occasions for being a danger to himself.

Forensic toxicologist, Dr. John Treuting, explained that Graham had been prescribed Risperidone, which is used to treat schizophrenia, and Venlafaxine for "major depression." Dr. Treuting determined that Graham's toxicology level for Venlafaxine (and its byproduct, O-desmethylvenlafaxine) was "significantly higher" than the therapeutic level, which may cause hostility, agitation, and suicidal inclination.

8

**F.      Rebuttal**

On April 15, 2016, at Donovan State Prison, Son went "ballistic" because an officer told him not to cover up his cell window.  Son called the officer "the 'N' word" and threatened to "beat … [his] ass."

On May 3, 2017, at Lancaster State Prison, an officer observed Son run down the stairs, notwithstanding his use of a wheelchair during the instant trial.

## DISCUSSION

**I.      Alleged Error Under *McCoy v. Louisiana*\***

Son raises a claim of structural error under *McCoy v. Louisiana*, *supra*, 138 S.Ct. 1500.  In *McCoy*, the Supreme Court of the United States held that the defendant had the right, under the Sixth Amendment, to insist that his trial counsel, during the guilt phase of a capital trial, refrain from conceding that the defendant had committed the three murders charged in that case, even though counsel reasonably believed that conceding guilt afforded the defendant the best chance to avoid a death sentence.  The high court explained that a defendant who "insist[s] on maintaining [his] innocence at the guilt phase of a capital trial," cannot be forced by counsel to concede guilt.  (*McCoy* at p. 1508.)  The high court noted that defense counsel can make strategic choices regarding how best to achieve a defendant's objectives, but the defendant chooses those objectives. (*Ibid*.)  *McCoy* further held that the trial court's error, in allowing trial counsel to concede the defendant's guilt despite the latter's persistent objections and contrary testimony, was structural, in that the defendant was entitled to a new trial irrespective of the existence of prejudice.

Son argues reversal is required under *McCoy* because his "defense counsel selected, with the trial court's approval, to pursue self-defense as a trial defense theory

---

\*      See footnote, *ante*, page 1.

9

when Son's objective of his defense was to assert innocence." (Unnecessary capitalization omitted.) Applying de novo review, we reject this contention. (*McCoy*, *supra*, 138 S.Ct. at p. 1511.)

### A.    *Factual Background*

The complaint initiating this case was filed on September 9, 2013. On July 2, 2014, the People declared they would seek the death penalty against Son. On August 14, 2015, the People reversed their position and declared they would not seek the death penalty. The preliminary hearing occurred on November 18, 2015. The original information, charging Son with one count of assault, with malice aforethought, by a prison inmate serving a life term, and alleging a prior strike sentence enhancement, was filed on November 24, 2015. An amended information adding a prior serious felony sentence enhancement was filed on October 21, 2016. Jury trial commenced on July 10, 2017, and ended on July 24, 2017.

Son bases his *McCoy* claim on statements made in *Marsden* and *Marsden*/*Faretta* hearings that occurred during the infancy of this case, specifically on May 21, 2014, and June 26, 2014, over three years before the July 2017 trial. (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); *Faretta v. California* (1975) 422 U.S. 806.)

In a *Marsden* hearing held on May 21, 2014, Son told the court defense counsel was exploring a self-defense theory for Son's defense. Son was not in favor of a self-defense theory and emphatically disagreed with defense counsel's exploration of this theory. Regarding the incident underlying the charge, Son explained: "I didn't do it. Never touched the guy." Son continued: "I'm like there's got to be a better defense to this, especially when I never touched the guy." Son complained defense counsel was not listening to him and had his "own agenda," adding "I told him from the git-go I didn't touch him, I didn't do it."

Defense counsel, for his part, explained to the court:

10

"It makes sense to me as an officer of the court and to diligently pursue every defense for Mr. Son that two gentlemen were in a cell and one is accused to have beaten the other to death, no one had access to the cell – those are at least the accusations—that I would have a job to pursue self-defense claims. I had started doing that. So the Court knows, I've been tracking down the alleged victim Michael Thomas Graham's criminal record, which includes some violent offenses in both San Luis Obispo County, San Bernardino County, Santa Clara and San Francisco.

"I believe in a death penalty case, I have a duty to pursue that. I'm not saying we are not going to pursue Mr. Son's defense. He wasn't there in the cell or the cell door was open, I'm not saying that. But I also am trying to explain to him why I'm doing what I'm doing."

Thereafter, the court and defense counsel had the following exchange:

"THE COURT: [Defense counsel], pursuing a defense, you are looking at all defenses, including self-defense, including Mr. Son wasn't there, including Mr. Son had nothing to do with it, even if he was there?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: You have not made up your absolute mind if this is going to be a self-defense case?

"[DEFENSE COUNSEL]: No, I have not. I'm just trying to keep an open mind."

The court denied the *Marsden* motion.

Thereafter, at a June 26, 2014 *Marsden*/*Faretta* hearing, the court asked Son to explain his contention that he should be allowed to represent himself because of a conflict of interest with counsel. The following exchange then took place:

"THE DEFENDANT: I think there's trust issues. I clearly told [defense counsel] the very first day I met him that I'm innocent, that I didn't beat the guy up, and it's as though he never heard me because he's telling me he wants to do a self-defense. And I didn't repeat myself after he told me that because I'm, like, 'wow.'

"THE COURT: Okay. So your attorney is recommending that you at least pursue one avenue, of raising a self-defense, as a defense, and you don't wish to do that because you perceive that's inconsistent with your position

11

that you did not do what you've been accused of; would that be a fair statement?

"THE DEFENDANT:  Right.

"THE COURT:  All right.

"THE DEFENDANT:  It's like he's not even hearing me.  He wants to do his own thing."

The court granted the *Faretta* motion; however, the same defense counsel was later reappointed.

Another *Marsden* hearing was held approximately three years later, on July 12, 2017, after jury selection but before the evidentiary phase of the trial commenced.  Son's statements to the court at this hearing were consistent, not with his statements at the early *Marsden* and *Marsden*/*Faretta* hearings described above but, rather, with his trial testimony, which occurred a few days later, on July 18, 2017.  As summarized above, Son testified at trial that, on the day in question, Graham attacked Son with a knife.  Son managed to take it away and slammed Graham from "wall to wall," "slammed [him] every direction," as hard as he could.  Son then "started striking" Graham; he "hit him at least eight to twelve times nonstop," as hard as he could, in the torso.  Thereafter, the two made up and Graham flushed the knife down the toilet.  Graham subsequently fell down, twice.  Son helped him up both times and then summoned officers for help.  Son testified he was "not a killer" and "didn't kill Mr. Graham."  He explained:  "It was the heat of the moment, the knife is there, I had to get him off of me and I swung as fast as I can.  I threw a burst of punches, 8 to 10."  He added:  "I did not want Mr. Graham to die, but he did, even though I tried my best to guarantee he wouldn't die and not hit him in the face or the neck.  I didn't stab him, I didn't choke him, I didn't hit him in the face, but he still died."

Defense counsel's closing argument was consistent with Son's testimony.  He contended Graham "attacked" Son and "hit him."  He argued Son was "not a killer."  He

12

explained: "There is no direct evidence that Son was trying to kill Graham. If you were trying to kill someone, you would go for their face and their skull. He's got a small contusion right here and a tiny scratch on his head. That's it." Counsel argued that Son acted to defend himself when Graham brought out a knife.

### B.    Analysis

In *McCoy*, the defendant was charged with the first degree murder of three family members. (*McCoy*, *supra*, 138 S.Ct. at p. 1506.) "Throughout the proceedings, he insistently maintained he was out of State at the time of the killings and that corrupt police killed the victims when a drug deal went wrong." (*Ibid.*) But defense counsel "eventually concluded that the evidence against McCoy was overwhelming and that, absent a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid at the penalty phase." (*Ibid.*) Defense counsel reported that McCoy was "'furious'" when told, two weeks before trial was scheduled to begin, that counsel would concede McCoy's commission of the triple murders. (*Ibid.*) McCoy told counsel "'not to make that concession,'" and counsel was aware of McCoy's complete opposition to telling the jury McCoy had killed the three victims; McCoy pressed counsel to push for acquittal. (*Ibid.*) Two days before trial was set to begin, McCoy sought to terminate counsel's representation but the court denied the request, telling counsel, "'[y]ou are the attorney,'" and "'you have to make the trial decision of what you're going to proceed with.'" (*Ibid.*)

Once trial began, defense counsel told the jury in his opening statement that "there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion than Robert McCoy was the cause of these individuals' death.'" (*McCoy*, *supra*, 138 S.Ct. at p. 1506.) McCoy protested and, out of earshot of the jury, told the court that counsel was "'selling [him] out'" by maintaining he "'murdered [his] family.'" (*Ibid.*) The trial court reiterated that counsel was

13

"'representing'" McCoy and told McCoy the court would not permit "'any other outbursts.'" (*Id*. at p. 1507.) Continuing his opening statement, counsel told the jury the evidence is "'unambiguous,' 'my client committed three murders.'" (*Ibid*.) McCoy testified in his own defense, "maintaining his innocence and pressing an alibi difficult to fathom." (*Ibid*.) In his closing argument, defense counsel reiterated that McCoy was the killer. (*Ibid*.) The jury then returned a unanimous verdict of first degree murder on all three counts. At the penalty phase, defense counsel again conceded, "'Robert McCoy committed these crimes,' (citation), but urged mercy in view of McCoy's 'serious mental and emotional issues.'" (*Ibid*.) The jury returned three death verdicts. (*Ibid*.)

Under these circumstances, the *McCoy* court reversed the judgment. *McCoy* drew a contrast between "[t]rial management," which is "the lawyer's province," and "decisions [that] are reserved for the client," which include "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*McCoy*, *supra*, 138 S.Ct. at p. 1508.) *McCoy* clarified: "Autonomy to decide that the objective of the defense is to assert innocence belongs in [the] latter category." (*Ibid*.) *McCoy* explained: "Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial." (*Ibid*.) The court noted: "These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." (*Ibid*.) "For McCoy, [the] objective was to maintain 'I did not kill the members of my family.'" (*Id.* at p. 1510.)

McCoy "opposed [defense counsel's] assertion of his guilt at every opportunity, before and during the trial, both in conference with his lawyer and in open court." (*McCoy*, *supra*, 138 S.Ct. at p. 1509.) Given this "stark scenario," *McCoy* admonished

14

that, "[p]resented with express statements of the client's will to maintain innocence," "counsel may not steer the ship the other way." (*Id*. at p. 1509.) In sum, *McCoy* held: "[C]ounsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission."[7] (*Id*. at p. 1510.)

The instant record is markedly different from that in *McCoy*. It shows that, in the early stages of the case, in May and June, 2014, well before the preliminary hearing and years before trial, Son was insistent he did not touch Graham and did not want defense counsel to focus on self-defense in defending him; counsel, meanwhile, was investigating various defenses, including self-defense, as the case was in its infancy. The record further shows that, by the time of trial in July 2017, Son had clearly changed his mind, as reflected in the July 12, 2017 *Marsden* hearing, as well as in his trial testimony a few days later. Indeed, when Son took the stand, he acknowledged he had beaten Graham but asserted he acted in self-defense and never intended to kill Graham. Defense counsel's closing argument was entirely consistent with Son's own trial testimony. Importantly, at the July 12, 2017 *Marsden* hearing, Son did not contest counsel's proposed theory of defense, nor did he object to counsel's line of argument at trial. In short, aside from Son's initial remarks in 2014, there was no evidence of any *persistent* disagreement between Son and counsel as to the theory of defense. On the contrary, the record reasonably shows Son and defense counsel were ultimately in sync as to the theory of defense presented to the jury. Therefore, Son has failed to show the existence of any *McCoy* error here.[8]

---

[7] Son's trial, which occurred in July 2017, preceded *McCoy*, *supra*, 138 S.Ct. 1500, which was decided on May 14, 2018. However, the People do not address the question whether *McCoy*'s holding is retroactive. Accordingly, for purposes of our analysis, we assume without deciding that *McCoy* is retroactive.

[8] Furthermore, it is unclear whether *McCoy* error can even be predicated on counsel's decision to pursue a defense of self-defense, as the latter is not tantamount to an

15

## II.     Trial Court's Failure to Instruct the Jury on Involuntary Manslaughter*

Son argues the trial court committed prejudicial error in failing sua sponte to instruct the jury on involuntary manslaughter, a lesser included offense of the charged crime.  (See *People v. St. Martin* (1970) 1 Cal.3d 524, 536; *People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).)  He contends there was substantial evidence to show that, rather than killing Graham with malice aforethought as charged, he committed only involuntary manslaughter.  (See *Thomas*, *supra*, at p. 813 ["An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense."]; *People v. Breverman* (1998) 19 Cal.4th 142, 155 (*Breverman*) ["*every* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury"].)

Son argues substantial evidence showed he committed only involuntary manslaughter under three theories.  First, citing *People v. Blakeley* (2000) 23 Cal.4th 82, 91, 96 (dis. opn. of Mosk, J.), he argues the killing was involuntary manslaughter because it occurred due to "an unreasonable self-defense and with gross negligence, but without malice."  Second, citing *People v. Burroughs* (1984) 35 Cal.3d 824, 835-836 (*Burroughs*), he argues that the killing was involuntary manslaughter because it was "an unintentional killing during the course of a noninherently dangerous felony committed with criminal negligence."[9]  Finally, citing *People v. Bryant* (2013) 56 Cal.4th 959, 968, 971, he argues that the killing was involuntary manslaughter because it was "an

admission of guilt to a criminal offense but, rather, is an affirmative defense, which results in outright acquittal unless the People disprove it beyond a reasonable doubt.

*     See footnote, *ante*, page 1.

**9**     *Burroughs* was overruled on other grounds by *People v. Blakely*, *supra*, 23 Cal.4th at p. 89.

unintentional killing during the course of a felonious assault committed with criminal negligence." "'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense.'" (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Campbell* (2015) 233 Cal.App.4th 148, 158 [same]; *People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*) ["We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant."].) We reject Son's contention that the evidence warranted a sua sponte instruction on involuntary manslaughter.

A trial court has a sua sponte duty to "'""instruct the jury on all general principles of law relevant to the issues raised by the evidence."'"" (*People v. Avila* (2009) 46 Cal.4th 680, 704.) This includes the duty to "instruct fully on all lesser necessarily included offenses supported by the evidence." (*Breverman*, *supra*, 19 Cal.4th at pp. 148-149.) "In the interests of justice, this rule demands that when the evidence suggests the defendant may not be guilty of the charged offense, but only of some lesser included offense, the jury must be allowed to 'consider the *full range* of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties,' so as to '*ensure* that the verdict is no harsher or more lenient than the evidence merits.'" (*Id*. at p. 160.)

Accordingly, if there is "'""substantial evidence" [citation], "'which, if accepted …, would absolve [the] defendant from guilt of the greater offense' [citation] but not the lesser,"'"" then the trial court must give an instruction on the lesser included offense. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) But "'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense.…' [Citation.] Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." (*People v. DePriest* (2007) 42 Cal.4th 1, 50.) In other words, evidence is substantial if "a reasonable jury

17

could find [it] persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8; *Breverman*, *supra*, 19 Cal.4th at p. 162 ["the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury"].) "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." (*People v. Wilson* (1967) 66 Cal.2d 749, 763; see also *People v. Rodriguez* (1969) 274 Cal.App.2d 487, 497.)

Here, Son was charged with assault committed with malice aforethought, resulting in the victim's death—effectively, a murder charge. Consequently, both the prosecutor and defense counsel referred, in closing arguments, to the charged offense as amounting to murder. The jury was instructed on malice aforethought—encompassing both express and implied malice—as an element of the charged offense. Specifically, the jury was instructed, in part: "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for this crime. [¶] The defendant acted with express malice if he unlawfully intended to kill the person assaulted. [¶] The defendant acted with implied malice if: One, he intentionally committed an act; two, the natural consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and, four, he deliberately acted with conscious disregard for human life." The jury was also instructed that the charged killing or murder would be reduced to voluntary manslaughter if the defendant had acted in the heat of passion or in imperfect self-defense.

*Brothers*, *supra*, 236 Cal.App.4th at p. 30, clarified that "[b]oth voluntary and involuntary manslaughter are lesser included offenses of murder."[10] *Brothers* further

---

[10] Here, the parties agree that voluntary manslaughter as well as involuntary manslaughter are lesser included offenses of both murder and the charged murderous

18

explained: "When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or, as some have described, 'mitigated'; and the resulting crime is voluntary manslaughter, a lesser included offense of murder." (*Ibid.*; see § 192, subd. (a) [voluntary manslaughter].) Involuntary manslaughter is the unlawful killing of a human being without malice. (§ 192.) Involuntary manslaughter is statutorily defined as "the unlawful killing of a human being without malice," while engaged in the commission of either (1) "an unlawful act, not amounting to a felony," or (2) "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b) [involuntary manslaughter].) A person is guilty of involuntary manslaughter under the first statutory theory when he or she commits a misdemeanor that "was dangerous to human life or safety under the circumstances of its commission." (*People v. Cox* (2000) 23 Cal.4th 665, 675.)

"[W]hile a killing in the course of commission of a noninherently dangerous felony does not appear to be precisely within one of these descriptions," our Supreme Court has held that "an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*Burroughs*, *supra*, 35 Cal.3d at p. 835.) In addition, "an unlawful killing in the course of an inherently dangerous assaultive felony without malice" (not otherwise amounting to felony murder) also constitutes involuntary manslaughter.[11] (*Brothers*, *supra*, 236

---

assault under section 4500. For the purposes of our analysis, we will therefore assume, without deciding, that involuntary manslaughter is a lesser included offense of the charged crime.

[11] The felony murder rule is generally inapplicable in such situations because, "when the underlying felony is an assaultive crime, the assault merges with the homicide, and

19

Cal.App.4th at p. 33.) However, as explained in *Brothers*, "when … the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter." (*Id.* at p. 35.) As explained below, *Brothers* is on all fours with the instant case and its holding provides the rule of decision here. Under *Brothers*, an instruction on involuntary manslaughter was not warranted in this case.

In *Brothers*, the defendant, Brothers, had given the victim, Gates, who was homeless, a place to live on her property. Subsequently, the defendant heard Gates had sexually molested her grandchildren. The defendant immediately summoned Gates, and along with other family members, beat Gates up. (*Brothers*, *supra*, 236 Cal.App.4th at pp. 27-28.) The defendant struck Gates "in the head and face multiple times with a broomstick with such force the stick broke in half." (*Id.* at p. 28.) Other family members beat Gates "about the face and body," and one of them "shoved a large cloth gag down Gates's throat, causing him to suffocate." (*Ibid.*) The coroner who conducted the autopsy on Gates's body, "opined Gates had died of asphyxiation due to airway obstruction and other contributing factors, including blunt force trauma." (*Ibid.*) "The jury acquitted Brothers of murder and found her guilty of voluntary manslaughter." (*Id.*

application of the felony-murder rule is prohibited." (*Brothers*, *supra*, 236 Cal.App.4th at p. 31; see *People v. Ireland* (1969) 70 Cal.2d 522, 539 [to allow use of felony murder rule when underlying felony is assault would preclude jury from considering the issue of malice in all cases where the homicide resulted from felonious assault, a category that includes the great majority of homicides; "[t]his kind of bootstrapping finds support neither in logic nor in law"].) "This prohibition of the application of the felony-murder rule to underlying assaultive felonies resulting in death, identified in *People v. Ireland*, *supra*, 70 Cal.2d at p. 539; is known in our jurisprudence as the *Ireland* merger doctrine." (*Brothers*, *supra*, 236 Cal.App.4th at p. 31, fn. 5.)

20

at p. 29.)  "On appeal Brothers contend[ed] the court erred in failing to instruct the jury sua sponte on involuntary manslaughter."  (*Id*. at p. 26.)

The *Brothers* court squarely addressed the question whether "a homicide committed without malice during the course of an inherently dangerous assaultive felony not otherwise amounting to felony murder was involuntary manslaughter."  (*Brothers*, *supra*, 236 Cal.App.4th at p. 33.)  *Brothers* concluded such a homicide was indeed involuntary manslaughter.  (*Id*. at pp. 33-34.)  Thus *Brothers* explained:  "Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury *could entertain a reasonable doubt* that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony."  (*Id*. at p. 34, italics added.)  But *Brothers* cautioned that, "'"'the existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense"'"; rather, "'[s]uch instructions are required only where there is "substantial evidence" from which a rational jury could conclude' the defendant committed the lesser, but not the greater, offense."  (*Ibid*.)

Brothers argued substantial evidence warranted an instruction on involuntary manslaughter, given her testimony to the effect she did not know "'this was going to happen.'"  (*Brothers*, *supra*, 236 Cal.App.4th at p. 34.)  The *Brothers* court rejected her claim because, "assuming Brothers meant she did not intend to kill Gates, intent to kill is an element of express, not implied, malice."  (*Ibid*.)  *Brothers* noted "malice is implied when the defendant engages in an act the natural consequences of which are dangerous to life and acts with conscious disregard for human life."  *Brothers* concluded, "there was simply no evidence from which a reasonable juror *could entertain a reasonable doubt* that Brothers had acted in conscious disregard of the risk her conduct posed to Gates's life."  (*Ibid*., italics added.)

21

The *Brothers* court explained that "Brothers's own account unequivocally established she engaged in a deliberate and deadly assault." (*Brothers*, *supra*, 236 Cal.App.4th at p. 34.) More specifically, Brothers "admittedly beat Gates repeatedly on the head and face with the large wooden broom handle with great force, causing blunt force trauma the deputy coroner testified was a contributing cause of death." (*Ibid*.) The court further noted, "[t]here was no evidence of an accidental killing, gross negligence or Brothers's own lack of subjective understanding of the risk to Gates's life that her and her confederates' conduct posed." (*Ibid*.) The court therefore held: "On this record, the trial court had no sua sponte duty to instruct the jury on involuntary manslaughter." (*Ibid*.; see *People v. Guillen* (2014) 227 Cal.App.4th 934, 1028 [involuntary manslaughter instruction unwarranted when the evidence left no room for reasonable doubt that the defendant acted with intent to kill or conscious disregard for human life]; see generally *People v. Evers* (1992) 10 Cal.App.4th 588, 596 ["If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice" unless the malice is otherwise negated by heat of passion or imperfect self-defense.].)

*Brothers* summed up its holding as follows: "In sum, when the evidence presents a material issue as to whether a killing was committed with malice, the court has a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense, even when the killing occurs during the commission of an aggravated assault. [Citations.] However, when, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, *and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed*, there is no sua sponte duty to instruct on involuntary

22

manslaughter. [Citations.] Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence." (*Brothers*, *supra*, 236 Cal.App.4th at p. 35, italics added; see *People v. Cook* (2006) 39 Cal.4th 566, 596 ["[Defendant] savagely beat [the victim,] to death. Because the evidence presented at trial did not raise a material issue as to whether [the] defendant acted without malice, the trial court was not obliged, on its own initiative, to instruct the jury on involuntary manslaughter as to [the victim]."].)

Under *Brothers*'s holding, an involuntary manslaughter instruction was not warranted in the instant case either. Just as in *Brothers*, on the instant record, no rational jury could find that Son acted merely with criminal negligence. Indeed, even crediting Son's testimony in its entirety, "there was simply no evidence from which a reasonable juror *could entertain a reasonable doubt* that [Son] had acted in conscious disregard of the risk [his] conduct posed to [Graham's] life." (*Brothers*, *supra*, 236 Cal.App.4th at p. 34, italics added.) Son admitted he savagely beat Graham, just as the defendant in *Brothers* admitted she had brutally beaten Gates. Son practiced mixed martial arts in professional "no rules" cage- and ring-fights; he testified he had "knock out capacity in both [his] arms." Son acknowledged that physically he had the capacity to easily knock out Graham, who was not a mixed martial arts fighter (as Son conceded). Son testified he slammed Graham from "wall to wall," "slammed [him] every direction," as hard as he could. Thereafter, Son "didn't want to give [Graham] a chance to swing at [him]," so he just "let it go and started striking." He hit Graham in the torso "at least eight to twelve times nonstop," again as hard as he could. Son explained, "[i]t was very fast and very rapid and very hard." He also said he had been trained to hit fast, rapid, and hard.

Graham suffered grievous injuries, revealing the brutality of the beating he suffered. Son's blows caused Graham's chest to collapse and pulverized it. Nurse Bernal, the first person to perform CPR on Graham, said she had "[n]ever" encountered

23

such severe chest injuries before. When Bernal performed CPR, Graham's chest gave "no resistance." Bernal explained: "There's no bone structure. It had the consistency of like jello." This was an unprecedented experience for Bernal in rendering CPR.

The forensic pathologist who performed the autopsy of Graham's body also described shocking injuries. He opined the manner of death was homicide and the cause of death was "multiple blunt force trauma." The pathologist testified that both lungs were significantly bruised and the lower lobes of each were "torn inside, macerated." He said these injuries were unusual and it would have taken a "large force" to lacerate a lung. He explained the lungs lie "in between the front and the back chest wall[s]" and "the walls have to come together and squish the lungs in between" to cause such injuries. In addition, Graham sustained "multiple fractures" of the rib cage, along with internal bleeding, indicating the fractures occurred while he was still alive. "The sternum was fractured twice, one at the upper portion and one at the lower portion," resulting in the chest appearing concave. The pericardium, i.e., the sack in which the heart resides, had hemorrhaged, which was "indicative of a large force being applied to the chest." Significant bruising and large contusions were evident around the aorta, the largest artery in the body, as well as around the inferior vena cava, the largest vein in the body, which injuries were consistent with blunt force trauma. In addition, Graham suffered bleeding in the intestinal cavity, a subcapsular hematoma ("blood blister") on the liver, a lacerated spleen, and contusions on the duodenum and large bowel. These organs are relatively well protected inside the human body and do not bruise easily; however, in this instance they were damaged from blunt force impact. Graham's neck muscles had also hemorrhaged, which was "consistent with strangulation or an attempted strangulation or a grabbing of the neck or a blow to the neck."

At the same time, Son did not raise a material issue as to whether he subjectively appreciated the danger to human life his conduct posed. On the contrary, Son was

24

experienced in mixed martial arts, had engaged in professional mixed martial arts fights, and had well-developed physical capabilities.  It was also clear that Graham was "frail" and weakened, as he suffered from hepatitis C and associated end-stage liver cirrhosis.  Despite the physical disparity between Graham and Son, Son repeatedly slammed Graham into walls and hit Graham non-stop, *as hard as he could*.

In short, the evidence indisputably showed that Son "deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue [was] presented as to whether [he] subjectively appreciated the danger to human life [that his] conduct posed." (*Brothers*, *supra*, 236 Cal.App.4th at p. 35.) Accordingly, a sua sponte instruction on involuntary manslaughter was not warranted and the trial court did not err in omitting one.

Even assuming the court was required to give an involuntary manslaughter instruction, failure to do so would be harmless on the instant record.  Failure to instruct on a lesser included offense supported by substantial evidence constitutes state-law error and is analyzed under the *Watson* standard of prejudice.  (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196 (*Gonzalez*), citing *People v. Watson* (1956) 46 Cal.2d 818, 836-837; *Thomas, supra, 5*3 Cal.4th at p. 814, fn. omitted ["The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.'"].)  "'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable

probability the error of which the defendant complains affected the result.'" (*Thomas*, *supra*, at p. 814.)

Here, the evidence revealed a brutal attack that resulted in unusually severe internal injuries and a pulverized, jello-like chest, which reflected the use of major force and the likes of which medical personnel had never seen before. At the same time, there was no evidence showing the killing was accidental, gross negligence on Son's part, or a lack of understanding on Son's part regarding the risk his conduct posed to Graham's life. Under these circumstances, had the jury been instructed on involuntary manslaughter, there is no reasonable probability Son would have obtained a more favorable verdict.[12]

## III.    Son's *Pitchess* Motion[13]*

Son notes he filed, on July 11, 2017, a *Pitchess* motion for certain personnel records of Department of Corrections Officer Alonzo Aranda. Specifically, Son asked for personnel records reflecting "dishonesty, falsifying reports, official misconduct, and [use of] excessive force." (*Pitchess*, *supra*, 11 Cal.3d 531.) Son asks us to "independently review the sealed transcripts and documents" related to the court's *Pitchess* inquiry, to determine the propriety of the court's rulings on his underlying motion. The People have "no opposition" to this request.

We review a trial court's *Pitchess* rulings for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1286; *People v. Hughes* (2002) 27 Cal.4th 287, 330 (*Hughes*).) If the trial court finds good cause to review an officer's confidential

---

**12**     Since we have addressed Son's claim of instructional error on the merits, we need not address his alternative claim that counsel was ineffective in failing to request an instruction on involuntary manslaughter.

**13**     *Pitchess*, *supra*, 11 Cal.3d 531.

*****     See footnote, *ante*, page 1.

personnel records, the court must, for purposes of appellate review, make a record of the materials it examined. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229-1230.) We subsequently review the "documents examined by the trial court" to determine whether the trial court abused its discretion in refusing to disclose the contents of the personnel records it reviewed in the first instance. *(Id.* at p. 1229; *Hughes, supra,* at p. 330.)

We have reviewed the transcripts of the *Pitchess* hearing the court held on July 19, 2017, in connection with Son's motion for relevant personnel records of Officer Aranda. At the *Pitchess* hearing, the court reviewed the official personnel file of Officer Aranda maintained at the Corcoran State Prison. The court also confirmed that the custodians of record for the prison had made a thorough search for all personnel records for Officer Aranda.

The trial judge did not include a copy of the records he reviewed, in the record of this case. Therefore, after this appeal was briefed, as part of creating a settled statement of the *Pitchess* proceeding, the superior court contacted the Department of Corrections to obtain the personnel file for purposes of our independent review. The trial judge who originally ruled on Son's *Pitchess* motion, certified that the Department of Corrections provided two envelopes of documents, one of which contained the personnel file the judge had reviewed at the *Pitchess* hearing. The second envelope contained additional documents that were not before the trial court at the *Pitchess* hearing. We have reviewed all the documents provided by the Department of Corrections for purposes of this appeal. None of the documents are within the scope of Son's *Pitchess* motion concerning Officer Aranda. Therefore, we cannot say the trial court abused its discretion in failing to disclose to Son any personnel records concerning Officer Aranda.

## IV. Fines and Fees

In common with a great many other cases, this case raises the issues decided in *Dueñas*, *supra*, 30 Cal.App.5th 1157, involving the constitutionality of imposing court

27

assessments and restitution fines as adjuncts to convicted defendants' sentences regardless of ability to pay. *Dueñas* is an innovative decision that has brought judicial attention across the state to bear on an important problem. In our view, one aspect of its holding correctly identifies a constitutional deficiency that has been overlooked in the past, while another is incompatible with controlling authority. In a nutshell, assessments designed as user fees to fund the courts (here, the court operations and court facilities assessments) cannot be administered to criminal defendants without regard to ability to pay, just as other cost-recovery charges that bear on access to the criminal process—such as fees for trial records to be used on appeal—cannot. But fines imposed as punishment (here, the restitution fine) are subject to the existing constitutional rule that monetary punishments in and of themselves need not be adjusted in accordance with ability to pay.

### A.    *Synopsis of Analysis*

Son, at sentencing, was ordered to pay a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), and a restitution fine in the minimum statutory amount of $280 (§ 1202.4, subd. (b)).[14] Citing *Dueñas*, Son argues that the imposition of the assessments and fine without a prior hearing to determine his ability to pay them contravened the guaranties of due process of law and equal protection of the laws contained in the state and federal constitutions.

We agree with *Dueñas* in part. As we explain in more detail below, there is a constitutional difficulty with the imposition of the court operations assessment and the court facilities assessment without a prior determination of a defendant's ability to pay. The implementation of these assessments—which are designed to function as user fees— without regard to ability to pay, places a greater burden on those who cannot pay than on

---

[14]    The court also imposed and stayed a matching $280 parole revocation restitution fine (§ 1202.45, subd. (a)). However, because this fine is essentially a corollary of the restitution fine imposed under section 1202.4, subdivision (b), we will not separately address it. (See § 1202.45, subd. (a).)

28

those who can. A solvent defendant who is ordered to pay the assessments suffers the loss of the assessment amounts, but an indigent defendant under the same order experiences the web of consequences of being a delinquent debtor—loss of access to credit, declarations of delinquency on other debts that have cross-default provisions, actual defaults on other debts caused by the strain of attempting to satisfy the court-imposed debt, harm to employment and housing relationships and prospects, loss in some cases of opportunities for expungement of convictions and early termination of probation, and more—and is still on the hook for the court-ordered payment, plus collection fees and interest.

This means it is more costly in real terms for indigent convicted defendants to have had access to courts in which to defend themselves, than it is for solvent convicted defendants to have had the same access. The situation is no different than it would be if, for instance, the cost of the court reporter's transcript was not waived for an indigent criminal appellant but instead became a debt payable to the court upon affirmance of the underlying conviction. Just as the latter situation would be prohibited by United States Supreme Court precedents holding that the right of access to the criminal courts is a fundamental right and its exercise cannot constitutionally be curtailed on the basis of ability to pay, so too is the imposition, without regard to ability to pay, of user fees in the form of court assessments, prohibited by these precedents.

On the other hand, it is not unconstitutional to impose the restitution fine without regard to ability to pay. Unlike the court assessments discussed above, the restitution fine is not a user fee collected from those who must use the courts, to fund the courts. Rather, it has been classified by our Supreme Court as a form of *punishment*. Furthermore, the United States Supreme Court has stated that the states' enforcement of judgments arising from unpaid fines imposed as *punishment*, is not constitutionally limited by the indigency of defendants. A statutory regime under which an unpaid, punitive fine is converted

29

automatically to a jail term, regardless of ability to pay, is not constitutional; nor is a scheme whereby a fine is a condition of probation, and failure to satisfy that condition leads to incarceration, regardless of ability to pay. But we are not faced with situations like those in this case, as the restitution fine imposed here is a monetary form of punishment that, if unpaid, would result, not in incarceration, but in a monetary judgment against the defendant.

In sum, our constitutional jurisprudence draws a critical distinction between user fees (in the form of nonpunitive court assessments) and monetary punishments (in the form of punitive fines), because imposition of the former implicates the constitutional right of access to the courts while imposition of the latter does not. Accordingly, we agree with *Dueñas* to the extent it holds that, under the Constitution, a defendant must have the opportunity to request an ability to pay hearing before court assessments are imposed at sentencing. However, in light of the United States Supreme Court precedents clarifying that, under the Constitution, indigency is not a bar to enforcement of monetary judgments arising from unpaid fines imposed as *punishment*, we disagree with *Dueñas* to the extent it further holds an ability to pay hearing is constitutionally required before imposition of the restitution fine.

### B.      Dueñas *Opinion*

Dueñas was convicted of one misdemeanor count of driving with a suspended license. The trial court placed her on 36 months' summary probation with 30 days in jail and a $300 fine as probation conditions, but offered to impose nine more days in jail as an alternative to the fine. Dueñas was disabled, unemployed, and homeless; she, her husband, and their two children lived alternately at her mother's home and his mother's home; and they had no money other than subsistence benefits they spent on basic necessities. Her clothing and telephone were her only assets. Her driver's license had long been suspended because of three citations she had received as a minor and had never

30

been able to pay. She had served jail time in lieu of fines in the past for driving while unable to pay these citations, and for each such conviction, assessments and fees were added that she also was unable to pay. She agreed to take the nine extra days in jail instead of adding another $300 to the unpayable debts. But there was no way for her to avoid the addition of a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), a $150 restitution fine (§ 1202.4), and a probation revocation restitution fine, stayed pending completion of probation (§ 1202.44). (*Dueñas, supra*, 30 Cal.App.5th at pp. 1161-1162.)

Dueñas asked the trial court for a hearing on her ability to pay the assessments and the fine. A hearing was eventually held and the court found Dueñas indigent based on her uncontested declaration. The court waived outstanding fees that had been imposed on her in prior cases to pay for the services of the public defender. It concluded, however, that the court facilities assessment and court operations assessment were mandatory regardless of ability to pay. It also determined that, despite the inability to pay, there were no "compelling and extraordinary reasons" as required by section 1204.4 for waiver of the restitution fine. (*Dueñas, supra*, 30 Cal.App.5th at p. 1163.)

The Court of Appeal reversed. It observed that the court facilities assessment and court operations assessment have been held to be nonpunitive fundraising measures, but also pointed out that for those unable to pay, they are punitive in effect, imposing hardship never experienced by those who can pay. This hardship is not limited to the unpayable indebtedness itself, but includes collection practices that can destroy the defendant's access to credit, interfere with higher-order commitments, such as the responsibility to make child care support payments, damage employment prospects and employment relationships, and otherwise impair the defendant's ability to be productive and functional after serving his or her time. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1164-

31

1168.)  And the restitution fine, though distinct from direct victim restitution, is acknowledged by our Supreme Court as being frankly punitive.  (*Id.* at pp. 1169-1170.)

The appellate court ruled that a judicial finding of a present ability to pay assessments and fines is required before a defendant can be ordered to pay them, despite the mandatory language in the statutes and the lack of a statutory provision requiring a finding of ability to pay.  Imposing requirements that are formally the same for all defendants but have punitive consequences for the indigent alone is "fundamentally unfair." (*Dueñas, supra*, 30 Cal.app.5th at p. 1168.)  As Dueñas had in fact already been found indigent by the trial court, the assessments were simply reversed.  For the restitution fine, the court concluded that the express language *prohibiting* use of inability to pay as a consideration for the sentencing court could best be reconciled with constitutional requirements by having the trial court impose the fine and stay it until, at some later time when Dueñas's circumstances might have changed, the People might be able to demonstrate her ability to pay at a hearing convened by the court for that purpose. (*Dueñas, supra,* at pp. 1168-1169, 1172-1173.)

(i)      *Dueñas's* Reliance on *Griffin v. Illinois*

In reaching its conclusion, the *Dueñas* court discussed two distinct categories of legal precedents.  The first category is represented by *Griffin v. Illinois* (1956) 351 U.S. 12 (*Griffin*), in which the United States Supreme Court held that the due process and equal protection clauses of the Fourteenth Amendment guarantee an indigent criminal appellant access to the entire record of his or her trial, including the court reporter's transcripts of the live proceedings, at no cost, since there would be no opportunity to bring an effective appeal without these materials or some form of equivalent.  (*Id.* at pp. 18-20.)  *Griffin* is based on what later became known as the basic or fundamental right of access to the criminal (and in limited situations civil) courts, which, under both a due process analysis and an equal protection analysis, the government cannot deny based on

inability to pay fees.  (See, e.g., *Tennessee v. Lane* (2004) 541 U.S. 509, 522 (*Tennessee*) [access to courts one of the "basic constitutional guarantees, infringements of which are subject to more searching judicial review"]; *M.L.B. v. S.L.J.* (1996) 519 U.S. 102, 110-116 [summarizing development of doctrine on basic right to access to courts].)

The *Dueñas* court maintained that although the assessments and fine at issue did not prevent Dueñas from using the court to defend against the charges, they still burdened her exercise of the right of access to the court in a way, and to a degree, that a solvent defendant's exercise of the right would not be burdened, and therefore contravened the principle underlying *Griffin*.  As will be seen, this is the part of *Dueñas* we accept, but only as to the assessments, which are correctly classified as *nonpunitive* fees, given the purpose (court funding) they are designed to serve.

The *Griffin* analysis is, however, inapplicable to the restitution fine, which is a monetary punishment and serves a punitive purpose.  Since, unlike the court assessments, it is not a user fee is designed to fund the courts, it does not implicate the right of access to the courts.  Stated differently, when the Legislature creates a monetary charge to be imposed as punishment for crime, the charge cannot logically be thought of as affecting a defendant's access to the courts, regardless of whether the defendant is indigent or not. Such a fine, regardless of what the proceeds are actually used for by the state, is not in any sense a financial condition or user fee imposed on defendants' exercise of the right of access to the courts.  Instead, it is a punishment imposed for defendants' crimes.  In view of this distinction, the United States Supreme Court has held that the indigency of a defendant is no bar to enforcing a money judgment for a punitive fine against a defendant who is unable to pay it.

(ii)     *Dueñas*'s Reliance on *In re Antazo & Bearden v. Georgia*

The second category of cases the *Dueñas* court relied on is represented by *In re Antazo* (1970) 3 Cal.3d 100 (*Antazo*) and *Bearden v. Georgia* (1983) 461 U.S. 660

33

(*Bearden*). The central concept in these cases is *the fundamental unfairness* of situations in which a defendant is *incarcerated* solely because of his or her *inability to pay fines* and other exactions imposed by criminal courts. In *Antazo*, a prisoner was serving time in a county jail after a trial court placed him on probation, conditioned on payment of a fine of $2,500 plus a penalty assessment of $625. He could not pay, so the court allowed him to satisfy the probation condition instead by serving one day in jail for each $10 of the unpaid amount. (*Antazo, supra*, 3 Cal.3d at pp. 103-105.) Our Supreme Court held that giving an indigent defendant a "Hobson's choice" between incarceration and paying fines he could not afford, violated the equal protection clause of the Fourteenth Amendment. (*Antazo, supra,* at pp. 103-104.) "[O]ur holding," the court stated, "is simply that an indigent who would pay his fine if he could, must be given an option comparable to an offender who is not indigent." (*Id.* at p. 116.) In other words, in any situation in which a solvent defendant would be offered a choice between payment and imprisonment, an indigent defendant cannot constitutionally be confronted with imprisonment as the only outcome that is a practical possibility.

In *Bearden*, the trial court placed the defendant on three years' probation, conditioned on payment of a $500 fine and $250 in restitution. He paid the first $200 with a loan from his parents, but was soon laid off from his job and, being illiterate and having only a ninth-grade education, could not find another. He had no income and no assets and did not pay the remaining debt before the deadline. After a hearing, the court applied a statute requiring automatic revocation of probation, entered the defendant's conviction, and remanded him into custody to serve the remainder of the three-year period. (*Bearden, supra*, 461 U.S. at pp. 661-664.) The United States Supreme Court held that "if the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of

34

punishing the defendant are available." (*Id.* at pp. 668-669.)  This holding was an extension of a preexisting rule that a court cannot """"[impose] a fine as a sentence and then automatically [convert] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full."""" (*Id.* at p. 667.)  The court cited both the due process clause and the equal protection clause of the Fourteenth Amendment as bases for the outcome.  (*Bearden, supra,* at pp. 665-667.)

The *Dueñas* court sought to analogize the unfairness described in these cases to the unfairness of the indigent having to shoulder a burden, the burden of being delinquent debtors and experiencing all the consequences of that status, that those with means to pay do not shoulder.  However, for punishment fines like the restitution fine in this case, the analogy to the situations addressed in *Antazo* and *Bearden* does not work for the reason indicated above:  the effects of enforcing monetary *punishments* against defendants who cannot pay them have been held not to be of constitutional concern.  Such monetary punishments do not implicate the right of access to the courts as explained above; nor do they, in and of themselves, implicate any other fundamental right, such as the right to liberty, which is implicated when a defendant actually faces incarceration solely for failing to pay a punitive fine.  (See *Antazo*, *supra*, 3 Cal.3d at p. 115.)

It is unnecessary to consider whether *Dueñas*'s attempt to analogize Dueñas's plight to the situations in *Antazo* and *Bearden* might work in assessing the constitutionality of the court revenue assessments, since, as discussed above, we are already holding that these assessments are invalid without a determination (at the defendant's request) of ability to pay, under *Griffin*, because of the unequal burdens their imposition places on the court-access rights of the indigent and non-indigent, respectively.

35

*C.*    *The Court Facilities and Operations Assessments as User Fees:* **Griffin and the Fundamental Right of Access to the Courts**[15]

*Griffin* is about charging criminal defendants for access to the court system whether they can afford it or not. It would be an exaggeration to say *Griffin* controls resolution of the issue of the constitutionality of the court facilities and operations assessments here; however, *Griffin*'s holding can logically be extended to resolve this question. The only real difference between *Griffin* and the instant scenario is that the relevant fees were assessed *prior* to court access in *Griffin* and *after* access here. The point is that, in both instances, payment was demanded despite indigence, which is the basis for analogizing the two situations.

Griffin and Crenshaw—the co-defendants in *Griffin*—were convicted of armed robbery. Like all other convicts in Illinois, they were entitled to appeal from their convictions. It was undisputed that their appeals could not be prosecuted without a stenographic transcript of the trial proceedings, and that they lacked the means to pay for a transcript. The state did not provide free transcripts to the indigent. (*Griffin, supra*, 351 U.S. at pp. 13-16.)

The high court held that by creating this obstacle to mounting a criminal appeal for the indigent—an obstacle that did not exist for appellants with means to pay—the state violated, under the due process and equal protection clauses of the Fourteenth Amendment, the indigent defendants' right to use or access the criminal process. (*Griffin, supra*, 351 U.S. at pp. 16-20.) Observing that providing equal justice for rich and poor is a problem centuries old, the lead opinion[16] stated:

---

[15]    See J. Snauffer's concurring opinion regarding his concurrence in this part of section IV.

[16]    Four justices signed the lead opinion written by Justice Black. Justice Frankfurter concurred in the result and submitted an opinion stating reasoning broadly similar to that of the lead opinion. (*Griffin, supra*, pp. 13, 20.)

"[O]ur own constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system—*all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'*" (*Griffin, supra*, 351 U.S. at p. 17, italics added.)

Subsequent cases applied *Griffin* to other fees and costs of using the criminal courts. (E.g., *Burns v. Ohio* (1959) 360 U.S. 252 [indigent defendant could not be charged filing fee for motion for leave to appeal to state supreme court from judgment of intermediate appellate court]; *Douglas v. California* (1963) 372 U.S. 353 (*Douglas*) [indigent defendants entitled to appointed appellate counsel]; *Lane v. Brown* (1963) 372 U.S. 477 [unconstitutional to condition free transcript for indigent defendant seeking to appeal from denial of postconviction relief, on consent of public defender]; *Roberts v. LaVallee* (1967) 389 U.S. 40 [indigent defendant entitled to free transcript of preliminary hearing for use at trial]; *Mayer v. Chicago* (1971) 404 U.S. 189 [indigent defendant entitled to adequate record with no fee to appeal from conviction although a fine, not incarceration, was the only punishment provided by the statute of conviction].)

The purpose of the requirement challenged in *Griffin*, i.e., that appellants cover the cost of trial transcripts, was simply to get the transcripts paid for by those who used them, in effect a user fee. There was no suggestion that collecting the cost of transcripts from appellants had anything to do with punishing them. In other words, the price of a transcript paid by appellants was effectively the same as an administrative fee collected from litigants to cover part of the state's costs of furnishing the proceedings.

California's assessments for court costs, although levied only against the convicted, have been held by California courts merely to be user fees charged to a large segment of court users for the purpose of funding the courts, and not to be any part of convicted defendants' punishments. This conclusion is consistent with the statements of purpose contained in the assessment statutes themselves. (*People v. Alford* (2007) 42

37

Cal.4th 749, 757; *People v. Fleury* (2010) 182 Cal.App.4th 1486, 1492-1494; Pen. Code, § 1465.8; Gov. Code, § 70373.)

As non-punitive incidents to utilization of the courts, imposed to cover certain of the courts' operating costs, the court facilities and operations assessments are like the transcript fees in *Griffin*. They are a part of the cost imposed on litigants for going forward. The difference is that in *Griffin* the cost blocked indigent defendants from going forward, while in the situation before us, the cost for use of the court is collected at the end of the proceedings, so indigent defendants instead receive an unpayable debt burden.

For indigent defendants, such a debt burden means they "pay" more for their admission ticket to defend themselves, and do so based on their indigence alone. In *People v. Neal* (2018) 29 Cal.App.5th 820 (*Neal*) (involving a statutory right to an ability to pay hearing for a probation supervision fee (§ 1203.1b)), the Court of Appeal described *consequences* for defendants who cannot pay a fee that far outstrip the monetary deprivation experienced by those who can. (The fees at issue in *Neal* were not conditions of probation (*Neal, supra,* at p. 826), so, as with the assessments here, nonpayment could not lead directly to incarceration.) *Neal* explained:

> "As legislative and other policymakers are becoming increasingly aware, the growing use of such fees and similar forms of criminal justice debt creates a significant barrier for individuals seeking to rebuild their lives after a criminal conviction. *Criminal justice debt and associated collection practices can damage credit, interfere with a defendant's commitments, such as child support obligations, restrict employment opportunities and otherwise impede reentry and rehabilitation.* 'What at first glance appears to be easy money for the state can carry significant hidden costs—both human and financial—for individuals, for the government, and for the community at large. ... [¶]... *Aggressive collection tactics can disrupt employment, make it difficult to meet other obligations such as child support, and lead to financial insecurity—all of which can lead to recidivism.*' [Citation.] As observed in a recent study regarding administrative fees in juvenile proceedings in California, 'Fee debt

38

becomes a civil judgment upon assessment.  If families do not pay the fees, counties refer the debt to the state Franchise Tax Board, which garnishes parents' wages and intercepts their tax refunds. Under state law, these fees are meant to help protect the fiscal integrity of counties.  They are not supposed to be retributive (to punish the family), rehabilitative (to help the youth) or restorative (to repay victims).'  [Citation.]  [This study] also points out that '[b]ecause Black and Latino youth are overrepresented and overpunished ... in the juvenile system, families of color bear a disproportionate burden of the fees' and the inordinate debt these families incur 'correlates with a greater likelihood of recidivism, even after controlling for case characteristics and youth demographics.'" (*Neal, supra*, 29 Cal.App.5th at pp. 827-828, fn. omitted, italics added.)

To bear the extra costs described in *Neal*, as part of the price of being tried, is not to "'stand on an equality before the bar of justice.'" (*Griffin, supra*, 351 U.S. at p. 17.)

It has been held, contrary to our view, that the fees challenged in *Griffin* affected the defendants' right to access to the appellate courts only because they were imposed *before* the proceeding and, if unpaid, precluded the latter in the first place, whereas the assessments at issue here are not levied until *after* conviction, so inability to pay does not burden the right to court access:

> "*Dueñas* drew what we regard as an inapt analogy between court assessments imposed following a criminal conviction and fees that, if imposed on indigent litigants or criminal defendants, impede their access to the courts in the first place.  The Legislature and courts rightly are concerned when filing fees and other court costs prevent indigent individuals from having their day in court.  Fees imposed *after* a case is completed, and judgment entered, however, do not deprive defendants of access to justice.  (See [*People v.*] *Santos* [(2019)] 38 Cal.App.5th [923,] 937 (dis. opn. of Elia, J.) ['a convicted person's inability to pay a court operations assessment or a court facilities assessment [does not] in any way impact that person's ability to access the courts']; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1039 (conc. & dis. opn. of Benke, J.) ['the imposition of the two assessments and one restitution fine on the defendant in *Dueñas* was not an issue of *access* to the courts or our system of justice'].)" (*People v. Caceres* (2019) 39 Cal.App.5th 917, 927.)

In other words, once a charging document has been filed, a defendant is going to be using the court one way or another, like it or not.  But we do not think that distinction

obviates the constitutional violation.  The fact that the differential burden on access is of a different kind here—a higher price in the form of a web of counterproductive hardships, rather than a lock on the door—does not make it constitutional.  It seems very improbable that in *Griffin*, the state could have cured its violation by charging for trial transcripts after the appeal was over rather than before it began, and converting the charge to a debt for those unable to pay.  We are not aware of any authority stating that where imposition of court fees on the indigent is unconstitutional, a loan would be as good a constitutional fix as a waiver.

New Jersey did, in fact, attempt to respond to *Griffin* in something like this manner.  *Rinaldi v. Yeager* (1966) 384 U.S. 305 was a challenge to a New Jersey statute under which those convicted of felonies and sentenced to prison terms—and no others— were required to pay transcript fees, without regard to ability to pay, after unsuccessful appeals.  The high court deliberately avoided the question of whether this scheme was inconsistent with *Griffin* because it placed a burden on the exercise of the right to appeal that was effectively heavier for the indigent than for others.  It decided instead that there was an equal protection violation because the fees were imposed only on those who got prison sentences; all other convicts did not have to pay.  The court's analysis was that the classification of those who got prison sentences versus those who did not, lacked a rational basis.  (*Rinaldi, supra*, 384 U.S. at pp. 306-309.)  Nevertheless, in summing up, the court stated:  "We may assume that a State can validly provide for recoupment of the cost of appeals from those *who later become financially able to pay*.  But any such provision must, under the Equal Protection Clause, be applied with an even hand."  (*Id.* at p. 311, italics added.)  Thus, even when declining to decide whether a state could solve its *Griffin* problem by charging a fee *after* a proceeding instead of *before*, the high court still assumed a determination (at the time of sentencing or thereafter) of *ability to pay* (present or future) would have to be made before the fee could be assessed and collected.

40

Another context in which the constitutionality of laws requiring defendants to pay costs of using the criminal courts is that of recoupment of the cost of providing appointed counsel. Statutes of this kind have been upheld, but the fact that they require a prior finding that the defendant is able to pay, or at some time will be able to pay, is among the reasons for their validity. (See, e.g., *Fuller v. Oregon* (1974) 417 U.S. 40, 52-54; *Donovan v. Commonwealth* (Ky.App. 2001) 60 S.W.3d 581, 584-585.) The California statute on that topic (§ 987.8) has been upheld against a constitutional challenge for this reason, among others. (*People v. Amor* (1974) 12 Cal.3d 20, 26.)

*Griffin* and some of its progeny were accompanied by dissents to the effect that under classical liberal capitalism, the political and economic system our Constitution presupposes as its foundation, the government has no responsibility to equalize wealth and thus none to mitigate the differential effects on the rich and the poor of the costs of using the criminal process. According to these dissents, it was not incompatible with our constitutional order to make access to various aspects of the criminal process difficult or impossible for some yet possible or easy for others. (See, e.g. *Griffin, supra*, 351 U.S. at pp. 34-39 (dis. opn. of Harlan, J.); *Douglas, supra*, 372 U.S. at pp. 360-363 (dis. opn. of Harlan, J.).) As one dissenter put it, laws under which expense renders parts of the criminal process inaccessible to the indigent "do not deny equal protection to the less fortunate for one essential reason: the Equal Protection Clause does not impose on the States 'an affirmative duty to lift the handicaps flowing from differences in economic circumstances.' To so construe it would be to read into the Constitution a philosophy of leveling that would be foreign to many of our basic concepts of the proper relations between government and society." (*Douglas, supra*, 372 U.S. at p. 362 (dis. opn. of Harlan, J.).) The same justice wrote of the "natural disabilities" and "natural disadvantages" afflicting the indigent in legal and other matters, deficiencies that he argued a state had no obligation, under the Constitution, to "alleviat[e]" or "remove."

41

(*Griffin, supra*, 351 U.S. at pp. 34-36.) And in another curious aside about what is and is not natural in the sphere of equality and inequality in the context of access to the criminal courts, a different justice referred to the holding of *Douglas* (and, presumably, similar cases) as "this new fetish for indigency." (*Douglas, supra*, 372 U.S. at p. 359 (dis. opn. of Clark, J.).)

The basic philosophical orientation reflected in these dissents was, however, never adopted by the high court, at least in the context of the right of access to the courts. Even at the peak of the cold war—when these seminal cases on the right of access to the courts were decided—a time when official and public enmity to the ideology of the Soviet Union was at its high water mark and every form of social equity might be mislabeled "communist" by some, the high court never went so far as to say "tough luck" to the poor in the context of access to the criminal courts.

The Supreme Court's majority can thus be said to have chosen deliberately, over the protestations of colleagues, to somewhat remove the issue of access to the criminal courts from the influence of individuals' relative success or failure as participants in a market economy. It has never wholly removed it from that influence, of course. The Constitution is not violated by the fact that some defendants can afford better representation than others, for example. The case law is instead about establishing limits beyond which the influence of criminal defendants' financial condition must not extend. In this case, we deal not with the ability to afford things and services that make a proceeding meaningful—like trial transcripts or counsel on appeal—but with something even more basic: the ability to afford the admission ticket. The assessments at issue here, exacted from convicted defendants to help defray court costs, have been framed by our Legislature and courts as the price of simply being a party defendant who has litigated unsuccessfully. The debt is imposed regardless of the defendant's ability to pay, and thus is equal in a formal and superficial sense; the reality is that the cost is much

42

greater for those for whom the dollar figure is unaffordable than for those for whom it is affordable.  In short, administrative, revenue-raising debt imposed on the convicted for merely having participated in the criminal process contributes to the financial ruin of the indigent, while being entirely affordable for others.[17]  *Dueñas* correctly placed this kind of court-access user fee in the column of those exactions the differential effect of which upon the indigent and not-indigent must be constitutionally controlled, as a matter of due process and equal protection.  Our system does not contemplate burdens imposed for the use of courts in which to defend oneself against criminal charges (or enter into a negotiated settlement thereof) to fall most heavily upon the indigent.

---

[17]      It can be easy to lose sight of the meaning of "indigent" in dollars and cents when analyzing these issues, and to be guilty of a failure of imagination when sizing up the constitutional significance of imposing debts on the poor.  Justice Marshall, dissenting in *United States v. Kras* (1973) 409 U.S. 434 (*Kras*), from the holding that the equal protection and due process clauses of the Fourteenth Amendment did not require a waiver for the indigent of a $50 filing fee for bankruptcy, made this point.  The majority, disregarding undisputed facts in the record, insisted that Kras must really have been able to scrape together less than a couple of dollars per week to pay the filing fee in installments, as the bankruptcy court allowed.  It compared this amount to the price of a movie ticket or one or two packs of cigarettes.  Marshall responded:

> "It may be easy for some people to think that weekly savings of less than $2 are no burden.  But no one who has had close contact with poor people can fail to understand how close to the margin of survival many of them are.  A sudden illness, for example, may destroy whatever savings they may have accumulated, and by eliminating a sense of security may destroy the incentive to save in the future.  A pack or two of cigarettes may be, for them, not a routine purchase but a luxury indulged in only rarely.  The desperately poor almost never go to see a movie, which the majority seems to believe is an almost weekly activity.  They have more important things to do with what little money they have—like attempting to provide some comforts for a gravely ill child, as Kras must do.

> "It is perfectly proper for judges to disagree about what the Constitution requires.  But it is disgraceful for an interpretation of the Constitution to be premised upon unfounded assumptions about how people live." (*Kras, supra,* 409 U.S. at p. 460 (dis. opn. of Marshall, J.).)

43

*Griffin* was decided before the United States Supreme Court developed its familiar framework of three levels of review (rational basis review, intermediate scrutiny, and strict scrutiny) for substantive due process and equal protection cases. In fact, all the United States Supreme Court cases we have found holding that fees or costs burdening court access for the indigent violate the due process or equal protection clauses of the Fourteenth Amendment, reached their conclusions without using that framework. The framework can readily be applied to the constitutional problem presented here, however, and it leads to the same result as to the constitutionality of the court assessments as we reached above. As discussed below, applying the "levels of scrutiny" framework also counters the argument that there is no infringement of the right of access to the criminal courts because the assessments in question are levied at the end of the proceeding at issue, not before it begins, and thus do not serve to block court access. We will focus on the equal protection clause, but the high court has noted that "[d]ue process and equal protection principles converge in the Court's analysis" in cases considering the constitutionality of the differential impact of fines and fees, and the same results are reached under both the due process and equal protection clauses. (*Bearden, supra*, 461 U.S. at p. 665.)

Strict scrutiny applies in an equal protection case when the challenged law uses a suspect classification to burden discriminatorily any of a wide variety of rights and interests, or uses any classification to burden discriminatorily a fundamental right, within the meaning of the terms "suspect" and "fundamental" as developed in case law on equal protection and substantive due process principles. (*Plyler v. Doe* (1982) 457 U.S. 202, 216-218.) Higher versus lower economic status or financial means is not a suspect classification. (*San Antonio Independent School Dist. v. Rodriguez* (1973) 411 U.S. 1, 27-28.) Access to courts, however, has been recognized by the Supreme Court as one of the "basic constitutional guarantees, infringements of which are subject to more searching

44

judicial review"—meaning, it is a fundamental right, triggering strict scrutiny, for purposes of equal protection and substantive due process analysis. (*Tennessee v. Lane, supra,* 541 U.S. at p. 522.)

Under strict scrutiny, the use of a classification to discriminate[18] in burdening a fundamental right (or the use of a suspect classification), can be upheld only if that use is narrowly tailored to support a compelling governmental interest. (*Grutter v. Bollinger* (2003) 539 U.S. 306, 326.) A challenged use of a classification is narrowly tailored, generally speaking, if there are no alternative means of adequately serving the compelling interest that would impose a lesser burden on the constitutional interest in question. (See, e.g., *Wygant v. Jackson Board of Education* (1986) 476 U.S. 267, 283-284.)

Turning to the constitutionality of the court assessments, the state's interest in funding the courts may be assumed to be compelling. But the funding mechanism here challenged—imposition of the assessments on convicted defendants without regard to ability to pay—does not come close to being narrowly tailored or *necessary* to serve that compelling governmental interest. There are many possible funding mechanisms that the state can tap to fund court operations that would not burden, at all, the exercise by indigent defendants of the right to access the courts. Waivers for indigent convicts is an

---

**18**    In this context, unlike in most others (see *Washington v. Davis* (1976) 426 U.S. 229, 242), discrimination that violates the equal protection clause need not be intentional discrimination. There is generally no reason to suppose that the imposition of fees burdening access to courts is intended by state governments to discriminate against the poor. But the United States Supreme Court has explained that the requirement of intentional discrimination does not apply where, as in the case of the distinction between those who can and cannot pay a particular charge, one hundred percent of the members of the disfavored group are subject to the disfavorable treatment and one hundred percent of the members of the favored group are not—as a matter of definition. In this situation, there is no need to establish discriminatory intent as an element of a constitutional violation. (*M.L.B. v. S.L.J., supra*, 519 U.S. at pp. 125-127 ["[U]nder respondents' reading of *Washington v. Davis*, our overruling of the *Griffin* line of cases would be two decades overdue."].)

45

obvious, but hardly the only, possibility. Consequently, the laws requiring the imposition of the court facilities and court operations assessments without regard to a defendant's ability to pay fail strict scrutiny and violate the equal protection clause.

Furthermore, the fact that these laws are far from narrowly tailored and *fail strict scrutiny*, itself refutes the notion there was no constitutional violation because the assessments in question were imposed at the end of the proceedings and did not serve to block access to the court entirely, as was the case in *Griffin* (where indigent defendants could not move forward with their appeals because of the prohibitive cost of obtaining a trial transcript).

Given our conclusion that the Constitution prohibits imposition of the court operations and court facilities assessments on those who are unable to pay and would therefore suffer the consequences of delinquent debt from imposition of these assessments, it follows that, prior to imposing such assessments, courts must give defendants an opportunity to request an ability to pay hearing for purposes of showing they are in fact unable to pay these assessments. Son did not have an opportunity to request an ability to pay hearing to make a showing that he could not pay the court assessments imposed at sentencing. Accordingly, "no evidence exists in the record from which to infer any findings in this regard." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490 (*Castellano*).)

We recognize that the court assessments at issue amount collectively to $70 and that it is tempting to simply presume that Son would be able, in all likelihood, to pay this sum. Indeed, the easy approach would be to find that denial of the opportunity to request an ability to pay hearing was harmless in Son's case. The People urge us to do precisely that, arguing that the trial court's imposition of the court assessments, without giving Son the opportunity to request an ability to pay hearing, was harmless because Son is an "able-bodied inmate" serving a "lengthy sentence." However, the issue of Son's inability

46

to pay was not addressed in the trial court and it would be inappropriate to presume that the *existing*, and *necessarily incomplete*, record definitively precludes Son from demonstrating an inability to pay.

To the extent the People's argument implies Son should be presumed *able* to pay the court assessments based on actual or potential prison employment, we reject that suggestion under the circumstances. While there is ample authority supporting the proposition that a prisoner's ability to pay fines and fees may be assessed on the basis of anticipated prison wages (see, e.g., *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035), reliance on that notion is purely speculative at this juncture, given the absence of a record on the issue and the fact that not all inmates are eligible for paid positions, which are considered a privilege and are subject to various restrictions and requirements. (Cal. Code Regs., tit. 15, §§ 3040, 3041.1.) Nor may we presume that, to the extent Son is unable to pay the court assessments, his status as an evidently long-term prisoner completely immunizes him from any and all consequences of being a delinquent debtor.

A limited remand is therefore warranted to give Son the opportunity to request a hearing to present evidence demonstrating his inability to pay the court assessments imposed by the trial court. (*Castellano*, *supra*, 33 Cal.App.5th at pp. 490-491.) Son bears the burden of raising the issue of his inability to pay the court assessments and to support that claim with relevant evidence. (*Ibid*.) Should Son request an ability to pay hearing for this purpose, the trial court may consider all relevant factors in determining whether Son is able to pay the assessments, including the likelihood of prison pay during the period of incarceration to be served (with the caveat that other fines, beyond the instant court assessments, may also have to be paid out of any prison wages Son may earn). If the trial court determines Son is *unable* to pay the court assessments, they must be stricken. (*Id*. at p. 490.)

47

### D. *The Restitution Fine: A Punitive Sanction, Not a User Fee*[19]

The restitution fine imposed here is a *punitive* sanction, *not* a *user fee* imposed on court-access so as to defray the costs of court operations. The access-to-the-courts analysis above does not apply to punitive fines (fines imposed as punishment), including the restitution fine. It has never been held that the imposition of any kind of criminal punishment should be analyzed as a burden placed on access to the courts. Punishment is instead a burden placed on the commission of crime. This is simply a matter of legislative intent.

With the court revenue assessments, the Legislature intended to cause every convicted defendant to pay a part of the cost of maintaining a court system, the existence of which is necessitated by the existence of crime. These exactions were conceived of by the Legislature as a way of recouping court costs from court users—specifically, convicted defendants, who may be said to have given rise, by their own acts, to the criminal accusations they had to access the courts to defend against—as a price to be charged to those given access to the courts. In contrast, in the case of fines imposed as punishment, the legislative intent is simply to punish crime.

*Dueñas*, however relies not just on access-to-the-courts jurisprudence to support its holding, but also on the concept of fundamental unfairness encompassed by substantive due process analysis, specifically, the fundamental unfairness of the indigent suffering more severe consequences for their convictions just because they are indigent. In this context, *Dueñas* relies on cases such as *Bearden* and *Antazo*, which consider the differential impact of punitive fines on the indigent, with the rub being that the defendants' inability to pay a fine resulted in conversion of the fine to jail time. Some similar cases are *Williams v. Illinois* (1970) 399 U.S. 235 (*Williams*) [court cannot give

---

**19** See J. Franson's concurring and dissenting opinion as to his concurrence in this part of Section IV.

48

indigent defendant longer jail term than maximum available for solvent defendant, just because indigent cannot pay fine imposed as part of sentence]; *Tate v. Short* (1971) 401 U.S. 395 (*Tate*) [conversion of traffic fine to jail time based solely on defendant's inability to pay unconstitutional].) All these cases are about the fundamental unfairness of sending a person to jail due to indigency, i.e., something beyond that person's control. *Dueñas* undertakes to extend this theme of fundamental unfairness to the situation here (i.e., the imposition of restitution fines as punishment), with the hardships attendant on delinquent debt taking the place of jail time as an unacceptable consequence of the inability to pay.

The trouble with this attempted extension is that it is in conflict with the body of cases it would extend. As a proviso to the proposition that fines cannot be converted to incarceration just because the defendant cannot pay them, the United States Supreme Court *has made it sufficiently clear that fines imposed as punishment on their own, without conversion to incarceration as a consequence of being unable to pay, need not take account of ability to pay to be constitutionally acceptable*. This rule emerges from the high court's reasoning in *Williams, supra*, on the way to the conclusion that the Constitution prohibits extension of a jail term beyond the maximum otherwise available, based on inability to pay a fine alone. The court emphasized that the constitutional difficulty arose from the challenged law's provision of *jail time* contingent upon nonpayment of a fine imposed without regard to ability to pay. There was no constitutional difficulty in the simple imposition of a fine without regard to ability to pay, where nonpayment would result merely in enforcement of a judgment for the debt. The court explained, were it otherwise, an indigent defendant, convicted of an offense punishable by jail time or a fine, could not, consistent with the Constitution, receive jail time based on an inability to pay a fine alone, but also could not be fined because of inability to pay. Thus, in a case in which jail time was only warranted by inability to pay

49

a fine, an indigent defendant would receive no punishment at all. The court saw no constitutional mandate for that result:

> "The State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction [*sic*; one or the other punishment]." (*Williams v. Illinois, supra*, 399 U.S. at p. 244.)

The point that the Constitution does not prevent a state from enforcing a money judgment for a *punitive* fine against an indigent defendant was reiterated in *Tate, supra*, 401 U.S. at page 399, and *Bearden, supra*, 461 U.S. at page 672.

While the case law is clear that indigence alone cannot be the basis for otherwise equal *punishments* to have worse secondary consequences for the indigent, all the cases focus on the secondary consequence of being i*ncarcerated* on account of inability to pay a fine. This rather specific discussion would seem to foreclose reliance on a *general principle* that indigence alone must not be allowed to cause otherwise equal punishments to have worse secondary consequences for the indigent. In other words, in specifically focusing on incarceration, the cases do not appear to support the idea that the Constitution prohibits a broad array of secondary consequences of otherwise equal *punishment*, for the indigent; and the particular consequence of being subject to enforcement of delinquent debt is, in the context of *punishment*, singled out as one that does *not* trigger a constitutional violation.

The specific discussion of enforcement of *punitive fines* against indigent defendants also reinforces the conclusion that the access-to-the-courts jurisprudence does not support the view that *fines imposed as punishment* can be treated as if they were barriers to access to the courts and subject to constitutional regulation accordingly. The Supreme Court simply says flatly that there is no difficulty in reducing indigents' unpaid *punitive fines* to judgment and then enforcing the judgment.

50

Finally, we can once again use the strict scrutiny/rational basis framework as a sort of cross-check to confirm the above conclusion that the imposition of the restitution fine as a punishment without reference to ability or inability to pay is not unconstitutional.

The right burdened by imposition of the *nonpunitive assessments* (i.e., user fees) , as noted in our discussion above, is the *fundamental right of access to the courts*. When it comes to *punitive fines*, however, we deal only with an interest in not being subject to punitive fines one cannot afford to pay, or not experiencing on account of indigence worse consequences from the imposition of punitive fines than those suffered by the solvent. Nothing of the latter sort—unlike access to the courts—has ever been held to be a fundamental right in the context of equal protection or substantive due process. And, as mentioned, the classification of rich and poor is not a suspect classification. Therefore, the applicable level of review for assessing the constitutionality of the restitution fine is relatively deferential rational basis review. (*Heller v. Doe* (1993) 509 U.S. 312, 319 (*Heller*); *Washington v. Glucksberg* (1997) 521 U.S. 702, 728.)

Under rational basis review, a challenged classification is consistent with the equal protection clause if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." (*Heller, supra*, 509 U.S. at p. 320.) Neither the legitimate purpose nor the rational relationship need ever have been spelled out by legislators or other government actors who chose to make use of the classification. Instead, the rational basis of the challenged scheme need only be "'reasonably conceivable'" in the mind of the court reviewing it. (*Ibid.*) The standard is thus highly deferential.

The state's interest in using fines for punishment is a legitimate government interest. The use of fines to deter and punish crimes can no doubt be criticized on various grounds, including the fact that the differences in individuals' means can result in substantial differences in the effectiveness of deterrence and the proportionality of

51

punishment. But such criticisms hardly render illegitimate the government's interest in using fines to punish.

What conceivable rational relationship is there between the state's interest in using fines as punishment and its toleration of the differing effects of the same fines on defendants *with and without* the ability to pay them? Taking account of defendants' ability to pay would add administrative complexity and expense to the process of imposing fines. It may also be true that *not* taking account of defendants' ability to pay complicates the process of fining defendants and makes it wasteful, resulting in fruitless expenditure of resources in attempting to collect money from those who have none. But the state's action need not be particularly efficient or effective to pass the rational basis test. Further, as the Supreme Court suggested in *Williams, Tate*, and *Bearden*, accepting the harsher impact of the imposition of debt on defendants who cannot pay it (i.e., indigent defendants), is a rational alternative to imposing no sanction or a lesser sanction than others suffer, when it comes to *punishment* for violating laws that rely on fines wholly or in part for their enforcement.

Consequently, the imposition of the restitution fine without regard to defendants' ability to pay survives rational basis review and, in turn, is not unconstitutional.

### E. Conclusion

To summarize the above in the smallest compass, we can state our separate holdings on the nonpunitive court facilities and court operations assessments, and on the punitive restitution fine, using both the older fundamental fairness language and the newer strict scrutiny/rational basis language in our jurisprudence, as follows:

**1.a.** The nonpunitive court facilities and court operations assessments may not be imposed on an indigent defendant because it is fundamentally unfair to grant some defendants access to a court in which to defend against criminal accusations only in conjunction with the creation of debts overwhelming to them (on account of their

indigency), while others are granted access without being saddled with overwhelming debts (on account of their solvency).

**1.b**.  The nonpunitive court facilities and court operations assessments may not be imposed on a defendant who is unable to pay because:  these charges are imposed on court users for use of the court, burdening their exercise of the fundamental right of access to the criminal courts; their imposition burdens those for whom they are unaffordable more than those for whom they are affordable, triggering an equal protection analysis under strict scrutiny; the difference in the burden on the two groups' rights to access to the courts is not necessary to further the government's interest in funding the courts (not narrowly tailored) because there are many ways to fund the courts that do not involve any such differential burden; and so the scheme fails strict scrutiny.

**2.a**.  The restitution fine, being a punishment, can properly be imposed on a defendant who is unable to pay it because, unlike in the case of imposition of jail time as a consequence of being unable to satisfy a monetary punishment, there is no fundamental unfairness in facing enforcement of a money judgment for a delinquent debt as a consequence of being unable to satisfy a monetary punishment.  Indeed, imposition of monetary fines without regard to ability to pay is necessary to ensure compliance with laws that rely wholly or in part on fines for their enforcement.

**2.b**.  The restitution fine can properly be imposed on a defendant who is unable to pay it because it is imposed for punishment; there is no fundamental right not to be burdened by a punitive fine; the distinction between those who can and cannot afford to pay a fine is not a suspect classification; and imposition of fines without reference to ability to pay is rationally related to the state's goal of punishment by fines because such punishment can be more easily administered without first determining each defendant's ability or inability to pay, among other reasons.

For all these reasons, we affirm the restitution fine but remand to give Son an opportunity to request an ability to pay hearing with respect to the court operations and facilities assessments previously imposed.[20]

## F.    Forfeiture

The People argue that Son is not entitled to relief because he did not raise the issue decided by *Dueñas* by objecting to the assessments and fine in the trial court.

We ordinarily do not consider claims of error where an objection could have been, but was not, made in some appropriate form at trial.  It is usually unfair to the trial court and the adverse party to take advantage of an error on appeal which could have been corrected during the trial.  (*People v. Saunders* (1993) 5 Cal.4th 580, 590; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.)  In conformity with common sense, however, our Supreme Court has stated that failure to object in the trial court does not forfeit an appellate issue " " " "where to require defense counsel to raise an objection "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule … would be changed on appeal." " " " "  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1215.)  Assessments and fines like those at issue in this case have existed in California for decades and have been imposed in countless cases without previously generating an appellate ruling that imposition of them on the indigent is unconstitutional.  *Dueñas* easily qualifies as a change in the law not likely to have been foreseen—exactly the sort of development it would be unreasonable to expect defense

---

[20]    To the extent Son argues the restitution fine violates the Excessive Fines Clause of the Eighth Amendment, that argument is minimally developed in Son's supplemental opening brief and the record is silent as to the factual information necessary for resolving that claim.  Therefore, on remand, Son may raise that issue in the trial court in the first instance.  We reject the People's argument that any claim to relief from the imposition of fines and fees lies *only* under the Eighth Amendment.

54

counsel to have on a list of objections to be made in the hope that the law might change someday.

The People, and some Court of Appeal panels, maintain that *Dueñas* error is forfeited if not raised in pre-*Dueñas* proceedings in the trial court, but this contention is untenable. The People rely on two propositions that are well-worn in this context, but, in this case at least, fictitious. The first is that if someone has anticipated the change, then the change ought to have been foreseen by reasonable defense counsel generally. The People invoke this proposition when they remark that Dueñas herself raised the issue in the trial court. But the inference that all other defense counsel ought to have foreseen a change in the law is not a valid one.

The second fictitious proposition is that because a new law is based on old principles, all lawyers can rightly be expected to see the new law coming, because they are presumed to know the old principles. The Court of Appeal in *People v. Frandsen* (2019) 33 Cal.App.5th 1126, cited by the People in this case, unintentionally revealed the fatal trouble with this notion, at least as applied to *Dueñas*. *Frandsen* concluded that the *Dueñas* issue was forfeited by failure to raise it in the trial court because the holding of *Dueñas* "flowed from *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660," and indeed even "[t]he Magna Carta prohibited civil sanctions that were disproportionate to the offense or that would deprive the wrongdoer of his means of livelihood." (*Frandsen, supra*, at pp. 1154-1155.) But the fact that the old principle had not previously been applied in the new manner, despite the old principle's continuous existence since 1983, 1970, 1956, or 1215, is a reason why the new application would be *un*expected.

The use of weak reasons to find the first wave of appellate challenges based on new case law to be forfeited, when almost no one foresaw the new law and thus did not

object in the trial court, is not appropriate. The anti-forfeiture doctrine recently reaffirmed in *Rangel, supra*, 62 Cal.4th at p. 1215, applies here.

## **DISPOSITION**[21]

The judgment of conviction is affirmed. The matter is remanded for further proceedings. On remand, Son shall be afforded the opportunity to request an ability to pay hearing with respect to the court facilities assessment (Gov. Code, § 70373) and the court operations assessment (Pen. Code, § 1465.8). If Son requests a hearing and demonstrates an inability to pay these assessments, they must be stricken; otherwise they shall remain in effect. The restitution fine previously imposed is affirmed, as an ability to pay hearing is not constitutionally mandated here with respect to the restitution fine.

SMITH, J.

---

[21] The disposition is consistent with section IV. of the lead opinion by J. Smith, along with J. Snauffer's concurring opinion in relevant part and J. Franson's concurring and dissenting opinion in relevant part.

SNAUFFER, J., Concurring.

I concur with Justice Smith's opinion, including the disposition, except in part to Section IV relating to fines and fees. I agree that upon remand Son will be entitled to a hearing with respect to his ability to pay court facilities and operation assessments under Government Code section 70373, subdivision (a)(1) and Penal Code section 1465.8, subdivision (a)(1). Under the case law developed in *People v. Duenas* (2019) 30 Cal.App.5th 1157 (*Duenas*), *People v. Castellano* (2019) 33 Cal.App.5th 485 (*Castellano*), and numerous subsequent cases, Son falls into that dwindling category of defendants who had no realistic opportunity to contest the imposition of fines and fees at the time of their pre-*Duenas* sentencing. (*Castellano, supra*, at pp. 489-490.)

I do not join, and express no opinion, whether in all cases restitution fines are punitive in nature and not properly subject to an ability to pay challenge. In this case, the minimum restitution fine of $300 was imposed pursuant to Penal Code section 1202.4, subdivision (b)(1). In these circumstances, Penal Code section 1202.4, subdivision (c) precludes consideration of the defendant's ability to pay. However, the defendant is not precluded from making an ability to pay argument under federal and state due process, the Eighth Amendment, and perhaps other grounds, given the current somewhat uncertain and developing state of the law.

On remand, Son will bear the burden of demonstrating a harm of constitutional magnitude, and making a record of his inability to pay the fines, fees, and assessments, a record which does not currently exist. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 96-98; review granted Nov. 13, 2019, S257844.) I express no opinion regarding how the trial court should rule on these matters.

In all other respects, I would affirm the judgment.


SNAUFFER, J.

1

FRANSON, Acting P.J., Concurring and Dissenting.

I concur with the majority that no structural error occurred under *McCoy v. Louisiana* (2018) 138 S.Ct. 1500 and that no error occurred in failing to instruct the jury on involuntary manslaughter. I also agree that no *Pitchess*[1] error occurred. Lastly, I concur with part IV of the lead opinion, to the extent it holds that remand to allow an ability to pay hearing as to the restitution fine pursuant to Penal Code[2] section 1202.4, subdivision (b)(1) is not constitutionally required based on the facts presented.

However, I dissent from my colleagues' conclusion that remand, and an ability to pay hearing, is necessary with respect to the court facilities and operation assessments under Government Code section 70373, subdivision (a)(1) and Penal Code section 1465.8, subdivision (a)(1), pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

Appellant filed a supplemental brief challenging, under *Dueñas,* the trial court's imposition of a $40 court operations fee (§ 1465.8); a $30 court facilities fee (Gov. Code, § 70373); and a $280 restitution fine (§ 1202.4, subd. (b)). The challenged fees and fine amount to $350. Appellant argues the trial court violated his federal and state rights to due process, equal protection and against cruel and/or unusual punishment by imposing the $70 in assessments and the $280 restitution fine without determining his ability to pay.

I find appellant's assertions based on *Dueñas* unavailing. *Dueñas* is distinguishable from the present matter, and appellant's constitutional rights were not

---

[1]   *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2]   All statutory references are to the Penal Code unless noted otherwise.

violated.  In any event, any presumed constitutional error is harmless beyond any reasonable doubt.**3**

In *Dueñas*, the defendant was an indigent, homeless mother of two, who subsisted on public aid while suffering from cerebral palsy.  She had dropped out of high school because of her illness, and she was unemployed.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.)  As a teenager, the defendant's driver's license was suspended when she could not pay some citations.  (*Id.* at p. 1161.)  She then was convicted of a series of misdemeanor offenses for driving with a suspended license, and in each case, she was given the choice to pay mandatory fees and fines, which she lacked the means to do, or go to jail.  (*Ibid.*)  She served jail time in the first three of these cases, but still faced outstanding debt, which increased with each conviction.  (*Ibid.*)

After her fourth conviction of driving with a suspended license, the defendant was placed on probation and again ordered to pay mandatory fees and fines.  The court imposed a $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)); a $40 court operations assessment (§ 1465.8, subd. (a)(1)); and a minimum $150 restitution fine (§ 1202.4, subd. (b)(1)).  The court also imposed and stayed a probation revocation restitution fine (§ 1202.44).  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1161–1162.)  The defendant challenged the fees and fines imposed under Penal Code sections 1202.4 and 1465.8, and Government Code section 70373.  (*Dueñas*, *supra,* at p. 1164.)  The trial court rejected her constitutional arguments that due process and equal protection required the court to consider her ability to pay these fines and assessments.  (*Id.* at p. 1163.)

On appeal, however, the *Dueñas* court determined that the defendant's due process rights had been infringed.  According to *Dueñas*, an ability to pay hearing was required

---

**3**     The parties disagree whether appellant forfeited his *Dueñas* claim by failing to object to the imposed fines and fees in the trial court.  I need not address forfeiture because appellant's claim fails on the merits and any presumed error is harmless beyond a reasonable doubt.

so the defendant's "present ability to pay" (*Dueñas, supra,* 30 Cal.App.5th at p. 1164) could be determined before assessments were levied for a court operations assessment (§ 1465.8, subd. (a)(1)) and a criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). (*Dueñas*, *supra,* at p. 1164.) The *Dueñas* court also concluded the minimum restitution fine of $150 (§ 1202.4, subd. (b)(1)) had to be stayed. The appellate court reached that conclusion despite section 1202.4 barring consideration of a defendant's ability to pay unless the judge is considering a fine over the statutory minimum. (§ 1202.4, subd. (c).) *Dueñas* held that "execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra,* at p. 1164.)

Subsequently, a different panel of the same court that decided *Dueñas* rejected the argument that *Dueñas* places a burden on the People to prove a defendant's ability to pay in the first instance. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489–490 (*Castellano*).) *Castellano* clarifies that the defendant in *Dueñas* had demonstrated her inability to pay in the trial court and, only in that circumstance, had the appellate court concluded fees and assessments could not constitutionally be assessed and restitution must be stayed until the People proved ability to pay. (*Castellano*, *supra*, at p. 490.) Thus, "a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court." (*Ibid.*)

According to the *Dueñas* court, the defendant lost her driver's license because she was too poor to pay her juvenile citations. She continued to offend because the aggregating criminal conviction assessments and fines prevented her from recovering her license. The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163–1164.)

3

*Dueñas* is inapplicable in the present matter. In contrast to *Dueñas*, appellant's incarceration was not a consequence of prior criminal assessments and fines. He was serving a life sentence for a 1990 torture conviction in violation of Penal Code section 207. Appellant was not caught in an unfair cycle, and he could have avoided the present convictions regardless of his financial circumstances. *Dueñas* is distinguishable and has no application to this case. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054–1055 (*Lowery*); *People v. Caceres* (2019) 39 Cal.App.5th 917, 928–929 [declining to apply *Dueñas*'s "broad holding" beyond its unique facts]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 ["*Dueñas* is distinguishable."].) Bad facts make bad law.

Even if *Dueñas* is applicable, the trial court did not violate appellant's constitutional rights when imposing the disputed fees and fines without conducting an ability to pay hearing. The *Dueñas* defendant presented compelling evidence the imposed assessments resulted in ongoing *unintended* punitive consequences. The *Dueñas* court determined those unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The *Dueñas* court noted the imposed financial obligations were also potentially unconstitutional under the excessive fines clause of the Eighth Amendment. However, *Dueñas* stated "[t]he due process and excessive fines analyses are sufficiently similar that the California Supreme Court has observed that '[i]t makes no difference whether we examine the issue as an excessive fine or a violation of due process.' [Citation.]" (*Dueñas*, *supra*, at p. 1171, fn. 8.)

This court has declined to expand *Dueñas*'s holding beyond the unique facts found in *Dueñas*. In *Lowery*, *supra*, 43 Cal.App.5th 1046, two defendants were convicted for a series of armed robberies, and various fees, fines and assessments were imposed against them. (*Id.* at pp. 1048–1049.) Based on *Dueñas*, the defendants in *Lowery* challenged the imposition of some of those financial obligations. The *Lowery* court, however, rejected a due process challenge based on *Dueñas*. The *Lowery* court noted the "unique

4

concerns addressed in *Dueñas*" were lacking. (*Lowery*, *supra,* at p. 1056.) Nothing established or even reasonably suggested the two defendants in *Lowery* faced ongoing unintended punitive consequences stemming from the imposition of fees, fines and assessments. The defendants did not establish how they suffered a violation of a fundamental liberty interest. To the contrary, the defendants had been incarcerated not because of their alleged indigency but because they were convicted of intentional criminal acts. Because unintended consequences were not present, the *Lowery* court held it was not fundamentally unfair for the trial court to impose fees, fines and assessments against the defendants without first determining their ability to pay.[4] (*Lowery*, *supra*, at pp. 1056–1057.)

 *Dueñas* was also strongly criticized in *People v. Hicks* (2019) 40 Cal.App.5th 320, 325–326, review granted November 26, 2019, S258946 (*Hicks*). The *Hicks* court held that, in contrast to *Dueñas*'s application of due process, a due process violation must be based on a fundamental right, such as denying a defendant access to the courts or incarcerating an indigent defendant for nonpayment. *Hicks* concluded that *Dueñas*'s analysis was flawed because it expanded due process in a manner that grants criminal defendants a right not conferred by precedent; that is, an ability to pay hearing *before* assessments are imposed. (*Hicks*, *supra*, 40 Cal.App.5th at pp. 325–326, review granted.) Under its facts, *Hicks* rejected a due process challenge to the imposition of fines and

---

**4** In *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), this court held that, in contrast to a due process challenge, the " 'excessive fines' " clause in the Eighth Amendment to the United States Constitution was a more appropriate avenue for an indigent defendant to challenge the imposition of fees, fines and assessments. (*Aviles*, *supra*, at p. 1069.) Under its facts, *Aviles* found no constitutional violation for the imposition of assessments and fines imposed on a felon who, after fleeing from officers, shot and wounded two of them. (*Id.* at pp. 1059–1060.) *Aviles* also concluded any presumed error was harmless because the felon had the ability to earn money while in prison. (*Id.* at pp. 1075–1077.)

assessments on a felon who, while under the influence of a stimulant, resisted arrest. (*Id.* at pp. 323, 329–330.)

Finally, and importantly, in *People v. Trujillo* (2015) 60 Cal.4th 850 (*Trujillo*), our Supreme Court held the forfeiture rule applies when a defendant fails to object to the imposition of probation supervision and presentence investigation fees under section 1203.1b.[5] (*Trujillo*, *supra*, 60 Cal.4th at pp. 853–854.) In finding forfeiture, the *Trujillo* court acknowledged the forfeiture doctrine does not apply to the advisement of certain federal constitutional rights. (*Id.* at p. 859.) As examples of such constitutional rights, the court stated: "[k]nowing and intelligent waivers are generally required when a criminal defendant gives up ' any significant right' [citation], such as the constitutional rights relinquished by a plea of guilty [citation], the right to counsel [citation], and the right to appeal [citation]." (*Ibid.*) Importantly, the *Trujillo* court stated "[h]ere, no comparably significant right is at stake. [The] [d]efendant has not argued that any core autonomy interests or constitutional rights are implicated by the waiver of a judicial hearing on a defendant's ability to pay, and no similar waiver is required *for any of the analogous sentencing fines and fees*." (*Ibid.*, italics added.) This language from *Trujillo* is compelling. The high court's comments show that no constitutional rights were implicated when the trial court imposed the disputed fees, fines and assessments against appellant without first conducting an ability to pay hearing.

The unique concerns addressed in *Dueñas* are lacking in the present case. Appellant does not establish the violation of a fundamental liberty interest. Indeed, he

---

**5** Section 1203.1b permits imposition of reasonable probation costs as a condition of probation. Costs can be imposed, in part, for probation supervision, a conditional sentence, mandatory supervision, certain investigations, and the preparing of certain reports. (§ 1203.1b, subd. (a).) The probation officer (or an authorized representative) shall determine a defendant's ability to pay all or a portion of these reasonable costs after considering any amount the defendant is ordered to pay in fines, assessments, and restitution. (*Ibid.*)

was not incarcerated because of his indigency, but for his continuing violent criminal acts while serving a life prison term. Appellant was not caught in a cycle of "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [his] poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163–1164.) As such, it was not fundamentally unfair for the trial court to impose the fees, fines and assessments in this matter without first determining appellant's ability to pay.[6] Thus, the trial court did not violate appellant's due process rights, and appellant's constitutional claims fail. (See *Lowery*, *supra*, 43 Cal.App.5th at pp. 1056–1057.)

Unlike the *Dueñas* defendant, who was placed on probation and subjected to a recurring cycle of debt, appellant was sentenced to an aggregate prison term of 27 years, to be served consecutive to the life term he was serving when he committed the present offense. Nothing in this record suggests he might be unable to work, or he might be ineligible for prison work assignments.[7] As such, we can infer he will have the opportunity to earn prison wages and he can start paying these financial obligations. (See *Lowery*, *supra*, 43 Cal.App.5th at p. 1060; *Aviles*, *supra*, 39 Cal.App.5th at p. 1076; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's prison wages].) Although it may take him time to pay his financial obligations, he can make payments from either prison wages or monetary gifts from family and friends. (*Lowery*, *supra*, 43 Cal.App.5th at pp. 1060–1061; *Aviles*, *supra*, 39 Cal.App.5th at p. 1077.) Thus, any presumed constitutional error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Therefore,

---

[6] Note the trial court was permitted to impose fines upon appellant following his convictions. (See, e.g., *Bearden v. Georgia* (1983) 461 U.S. 660, 669 [a state has a fundamental interest in "appropriately punishing persons—rich and poor—who violate its criminal laws" and poverty does not immunize a defendant from punishment].)

[7] Appellant is 49 years old.

7

appellant's constitutional challenge is without merit and remand is unnecessary.  (See *Lowery*, *supra*, 43 Cal.App.5th at p. 1061.)

FRANSON, Acting P.J.